Henry J. KILMER, Appellant/Cross–
Appellee,

v.

**DILLINGHAM CITY SCHOOL
DISTRICT, Appellee/Cross–
Appellant.**

Nos. S–5674, S–5694.

Supreme Court of Alaska.

Feb. 14, 1997.

Lee Holen, Law Offices of Lee Holen, Anchorage, for Appellant/Cross–Appellee.

Dale W. House, Lane, Powell, Spears, Lubersky, Anchorage, for Appellee/Cross–Appellant.

Before RABINOWITZ, MATTHEWS, COMPTON, EASTAUGH and FABE, JJ.

## OPINION

EASTAUGH, Justice.

## I.  INTRODUCTION

Henry Kilmer, former superintendent and principal of the Dillingham City School District (District), appeals a superior court decision upholding the decision of the Dillingham City School Board (Board) to terminate his employment for good cause.

The superior court held that Kilmer's lawsuit was properly an administrative appeal and that the appeal could proceed although it was filed more than thirty days after the Board decided to terminate his employment. Having converted his claim to an administrative appeal, the court held that Kilmer had no right to a jury trial.  Kilmer appeals both the court's decision finding the Board had

good cause and its decision converting his case to an appeal. The District appeals the court's decision to waive the time limit for filing an administrative appeal. We affirm.

## II. *FACTS AND PROCEEDINGS*

Kilmer began work as assistant superintendent for the Dillingham City School District in 1982 and became superintendent in 1984. In 1987 Kilmer and the District extended his contract for two years. The contract provided that "[e]ither party may terminate this contract for good cause. With regard to terminating the Superintendent, good cause shall include, but not be limited to, the grounds set forth in [AS] 14.20.170."[1] The parties later agreed that under the contract "good cause" would include the statutory causes or "offenses similar to those enumerated in the statute." The agreement also provided that Kilmer "waive[d] any rights as set forth in [AS] 14.20.095 through [AS] 14.20.210, inclusive thereof,"[2] and waived any right to the District's grievance procedures. The contract also stated that "[n]evertheless, the Superintendent shall have the right to address the Board concerning any aspect of the Superintendent's contract or concerning possible termination of the contract."

On January 4, 1988, the parties renewed Kilmer's contract for three years. Kilmer drafted an addendum (Addendum One) that purported to memorialize the parties' agreement. Addendum One was approved by Board President H. Sally Smith and School Board Clerk Joyce Armstrong and was included in minutes later approved by the Board. It provided:

The following changes were approved at the January 4, 1988 Regular School Board Meeting:

1) Renew Superintendent's Contract for 3 years.

2) No salary determination at this time.

3) The use or reimbursement of all unused leave days at any time.

Pursuant to Addendum One, Kilmer cashed in $19,200 in unused leave during the 1988 fiscal year and another $5,100 in unused leave in June 1989.

Near the end of the 1987–88 school year, Dillingham's high school/middle school principal announced his retirement, effective at the end of the school year. As superintendent, Kilmer attempted to locate another principal. The Board interviewed, but rejected, two local candidates.

On July 16, 1988, the Board met in special session to determine what to do about the vacant principal position. Board member Jackson McCormick was not present. Kilmer and the Board agreed that Kilmer would act in a dual role as superintendent and principal. The parties agreed that Kilmer would receive additional compensation for these extra duties. Kilmer suggested that the Board retroactively purchase pension benefits for him under the Alaska Teachers' Retirement System (TRS).[3] At the time, the parties did not know the precise cost of purchasing the retirement years for which Kilmer was eligible. Kilmer testified that he informed the Board that the cost of purchasing half of the years for which he was eligible would be $30–40,000. Board members testified later, and the trial court found, that the Board believed it had agreed to pay Kilmer

---

1. AS 14.20.170 provides:
   A teacher ... may be dismissed at any time only for the following causes:
   (1) incompetency, which is defined as the inability or the unintentional or intentional failure to perform the teacher's customary teaching duties in a satisfactory manner;
   (2) immorality, which is defined as the commission of an act that, under the laws of the state, constitutes a crime involving moral turpitude; or
   (3) substantial non-compliance with the school laws of the state, the regulations or by-laws of the department, the by-laws of the district, or the written rules of the superintendent.

2. AS 14.20.095–.210 sets out procedural protections for teachers who are terminated or non-retained.

3. As a means of encouraging experienced teachers to move to Alaska, the State allows teachers to retroactively purchase up to ten years worth of pension credit for years of service performed in another state. Payments are calculated to represent the amount the teacher would have paid into the system in a year gone by, plus interest from that past year until the date of payment.

an additional $30,000 for the 1988–89 school year. The parties agreed that if the arrangement worked out, it would be repeated the following year, for a total of ten years of purchased credit.

Kilmer drafted a second contract addendum (Addendum Two). It stated:

The following changes were approved at the July 16, 1988 Regular School Board Meeting:

1. Base Salary for FY 89 will remain the same as in FY 88.

2. A net sum equal to back retirement years will be paid the Superintendent divided over two years upon assuming the Principal duties.

Board members Smith and Armstrong approved Addendum Two on August 5. The same day, the Board conferred upon giving Kilmer the principal's position. The Board approved the July 16 and August 5 meeting minutes at the regular August 15 meeting.

The District business manager, Marie Wheeler, consulted a six-month old TRS report and determined that the cost of purchasing five years of credit would be approximately $50,000. Kilmer received this amount in two lump sums, receiving $25,000 on August 11, and, after Wheeler had consulted with TRS and determined the exact cost of purchasing five years of pension credit, Kilmer received a second check, for $24,581, on November 7. Both checks were made out by business manager Wheeler and signed by Board member Shirley Wiggins.

Kilmer did not use this money to purchase past retirement years in TRS. Without telling the Board, Kilmer put the funds into money market accounts and later used them to purchase a travel agency in Oregon. The public was not aware that Kilmer was to receive additional benefits for filling the principal's position.[4]

In January 1989 the Board conducted an evaluation of Kilmer which was very positive. In March Kilmer's principal's compensation became public knowledge. There were complaints about the compensation during Board

meetings and Kilmer stated that "he and the Board need[ed] to sit down and clarify the intent of the [B]oard as to what the compensation was to be." Board member McCormick launched a recall petition against Board President Smith and Board members Armstrong and Wiggins.

The Board retained an accounting firm to report on the compensation issue. The accountants concluded that the language of Addendum Two was authorized by the motion which the Board had approved in July 1988 and that "it appears that the school board intended to pay the superintendent a lump sum" sufficient to pay for five years of pension credit. The accountants also concluded that the amount of money Kilmer received was consistent with a "reasonable interpretation" of the Addendum. The accountants, however, were not asked to determine if the language of Addendum Two reflected the Board's intent.

In early April 1989 Kilmer and several Board members met in private to discuss the extra compensation issue, and Kilmer agreed to reimburse the District so that his additional compensation would be reduced to the $30,000 that Board members insisted they had agreed to pay him. Kilmer announced his promise to reduce his principal's compensation to $30,000 that same day at a public Board meeting.

McCormick's recall efforts continued, and in late April his lawyer wrote a letter stating that the Board could be sued to recover Kilmer's principal's compensation. The Board asked its attorney, Richard Fossey, to investigate Kilmer's compensation package. Fossey concluded that Kilmer had received nearly $50,000 in compensation for being principal, rather than $30,000, as a result of "poorly drafted documents and a fundamental misunderstanding between the School Board and the Superintendent," and that Kilmer should return the excess funds. Given that the Board had approved the July 16, 1988 minutes and that two Board members signed Addendum Two, Fossey con-

---

4. The superior court indicated that before March 1989 both Kilmer and the Board were responsible for a public misperception that Kilmer was not receiving extra compensation for his assumption of the principal's duties.

cluded that Kilmer had "reasonably accepted the additional compensation" and that "the amount paid to Mr. Kilmer [was] appropriate." Fossey noted that while it may have been "imprudent" to pay Kilmer in advance, there was "no legal significance" to the timing of the payments. Fossey's report concluded by recommending that Kilmer's contract be reformed to reflect the Board's intention that the extra compensation was to be $30,000. At the behest of the Board chair, Fossey prepared a resolution expressing confidence in Kilmer and extending his contract as superintendent/principal for an additional year.

The resolution was tabled at the Board's June 5 meeting. On June 6 Kilmer cashed out $5,100 worth of unused leave. On June 9 the Board suspended Kilmer with pay "pending [an] investigation regarding [his] compensation." A report by an accounting firm commissioned by the Board found, however, "no irregularities" in the District's payments to Kilmer.

On July 3 the Board decided to terminate Kilmer. It sent Kilmer a bill of particulars explaining the reasons for its decision and stated that his termination was effective July 15. The bill of particulars listed ten reasons (discussed *infra*) for Kilmer's dismissal.

In April 1990 Kilmer filed suit against the District, alleging wrongful discharge, defamation, and a number of economic torts. The District moved to dismiss on the ground that Kilmer's suit was an untimely administrative appeal of the Board's decision. On cross-motions for summary judgment, the trial court concluded that Kilmer had no right to an original action/jury trial on his discharge claim, but found that there were reasons for relaxing Appellate Rule 602's deadline for administrative appeals. The trial court also concluded before trial that if Kilmer prevailed, (1) he would be entitled to damages resulting from his failure to vest in TRS,[5] and (2) he must offset his damages by the salary he received from his new employment (as a superintendent in Idaho), but not by the lower cost of living at his new job location.

The court conducted a *de novo* bench trial and upheld Kilmer's termination. It held that some of the reasons listed in the bill of particulars were not grounds for termination. For example, the court rejected claims that Kilmer had demonstrated good cause for discharge by failing to perform timely evaluations and ensure that other District personnel did the same. The court concluded, however, that the Board did have good cause for terminating Kilmer on the basis of his behavior before and during the compensation controversy. The court found that Kilmer's actions resulted in the Board's loss of trust and amounted to statutory incompetence, or in the alternative, were a breach of fiduciary duty, a "similar ground" to incompetence.

Kilmer appeals, asking us to reverse the trial court's finding that there was good cause for the termination. He also asks us to reverse the denial of his request for a jury trial, and to remand for (1) determination of damages (if he prevails on his discharge claim), or (2) a new trial on the claims in his complaint (if we affirm the court's finding of good cause).

The District cross-appeals, seeking reversal of the lower court's decision forgiving Appellate Rule 602's thirty-day filing deadline. The District also appeals two pre-trial damages rulings: that if Kilmer prevailed he was entitled to damages resulting from his failure to vest in Alaska's retirement system; and that any damages Kilmer recovered need not be offset by Kilmer's savings resulting from Idaho's lower cost of living.

### III. *DISCUSSION*

#### A. *Jury Trial*

Kilmer argues that the trial court erred in holding that his action was an administrative appeal, thereby eliminating his right to a jury trial. He argues that because his contract required him to waive all statutory procedural rights and district grievance procedures, his only means of redress was through an original civil suit tried before a jury.

**5.** Kilmer had served in Dillingham seven of the   eight years necessary for his pension to vest.

We have held that a "claim is functionally an administrative appeal if it requires the court to consider the propriety of an agency determination." *Haynes v. State, Commercial Fisheries Entry Comm'n,* 746 P.2d 892, 893 (Alaska 1987). Additionally, we have held that

> the test for determining when an entity is acting as an 'administrative agency' is functional. Whenever an entity which normally acts as a legislative body applies policy to particular persons in their individual capacities, instead of passing on general policy or the rights of individuals in the abstract, it is functioning as an administrative agency

within the meaning of Alaska Appellate Rule 602. *Ballard v. Stich,* 628 P.2d 918, 920 (Alaska 1981) (citing *Winegardner v. Greater Anchorage Area Borough,* 534 P.2d 541, 544–45 (Alaska 1975)). In each of these cases there had been an administrative adjudication. The language which we quoted above from *Haynes* is somewhat overbroad. The applicability of Appellate Rule 602 also depends on an additional test: whether the entity engaged in an adjudicative proceeding. *Moore v. State,* 553 P.2d 8, 29 (Alaska 1976) (rejecting claim that appeal from non-adjudicatory agency action was not time-barred by predecessor to Appellate Rule 602). *See also Owsichek v. State,* 627 P.2d 616, 619 (Alaska 1981). *Cf. State v. Alex,* 646 P.2d 203, 215 (Alaska 1982) (holding exhaustion of administrative remedies doctrine insupportable where there was no administrative adjudicatory proceeding "which had various routes of administrative appeal.").

In the present case the question whether Kilmer should have proceeded by way of an administrative appeal is potentially of consequence in only two respects: his entitlement to a jury trial, and application of Appellate Rule 602(a)(2)'s thirty-day period for taking an appeal. For the reasons expressed below, we hold that Kilmer waived any right he might have had to a jury trial, and that the thirty-day period would not apply to him. Thus it is not necessary to decide whether Kilmer should have brought this case pursuant to Appellate Rule 602.

■ Our conclusion that Kilmer waived his right to a jury depends on three documents in the record. First, the Dillingham School District withdrew its objection to Kilmer's demand for a jury trial and filed with the court written notice of this change of position. Even after Dillingham agreed to withdraw its objection to a jury trial, the trial court appears to have had reservations about the parties' resulting plan to try all of their claims before a jury. In a handwritten addendum to a calendaring notice for a pre-trial hearing, the court instructed the parties that it planned to "inquire as to the parties' intentions to present *all* issues to a jury despite the lack of authority to do so on an administrative appeal." Just two days later, Kilmer's attorney wrote a letter to the court, stating that "[t]he parties are in agreement that all Kilmer's claims may be tried before the court in a judge-tried case."

In his briefs to this court, Kilmer argues that his stipulation to a bench trial did not cover all his claims, but only his remaining tort claims. Kilmer argues that it was impossible for him to waive his rights to a jury trial on the contract claims in the letter to the trial judge because the court had already denied his request for a jury and "it already was clear, over [Kilmer's] objections, that the contract claim would be heard without a jury."

Were it not for Dillingham's filing of a withdrawal of its opposition and the trial court's subsequent order, which emphasized that the parties should be prepared at the pre-trial hearing to address the propriety of a jury trial on *all* of their claims, Kilmer's counsel's letter could be construed as ambiguous. However, review of the record as a whole leaves us with the firm belief that both parties agreed to present all of the claims to the court. The trial court was left with this impression as well, noting at the outset of its findings that "[b]y stipulation of the parties, all matters were tried to the court sitting without a jury...." Having agreed to a judge trial on all claims, Kilmer cannot now argue that it was error not to submit his claims to a jury. Because Kilmer received the judge trial to which he agreed, we need

not decide whether it was error to classify his action as an administrative appeal.

### B. *Timeliness of Kilmer's Suit*

■ Alaska Appellate Rule 602 requires that administrative appeals be filed within thirty days of the date of the decision. Alaska R.App.P. 602(a)(2). Kilmer's suit was filed nine months after he received the bill of particulars. Nevertheless, the court allowed the suit to continue as if timely filed. The District argues that the trial court erred in relaxing the time limit and allowing Kilmer to proceed with his appeal.[6] However, strict application of Rule 602(a)(2) requires that the agency clearly indicate that the decision complained of is a final order and that the claimant has thirty days to appeal. *Skudrzyk v.*

6. We review a court's decision whether to relax the Rule 602(a)(2) time limit under the abuse of discretion standard. *Skudrzyk v. Reynolds*, 856 P.2d 462, 463 n. 3 (Alaska 1993); *Anderson v. State, Commercial Fisheries Entry Comm'n*, 654 P.2d 1320, 1322 (Alaska 1982).

7. The bill of particulars listed the following ten reasons for Kilmer's termination:

1. Your conduct with regard to [the July 16, 1988 meeting] was unprofessional in that no agenda of the meeting was prepared, the meeting was not tape recorded as is the general practice in Dillingham City School District, and the minutes of the meeting which were based upon your notes did not accurately nor adequately reflect the School Board's intention regarding your contract and compensation.
2. You did not prepare your contract addendums [sic] in accordance with Department of Education regulations.
3. Checks were issued to you which were not issued nor executed in compliance with the Dillingham City School District Policy Manual § 602.
4. You failed to evaluate personnel in accordance with the ... District Policy Manual....
5. You have failed to properly supervise the elementary principal to insure that the evaluations were properly completed in a timely manner.
6. You exercised poor judgment in recommending to the School Board that you be paid a significant amount of money to perform, in addition to your duties as a full time superintendent, the duties of a principal which could not be performed adequately while being the full time superintendent....
7. You misrepresented the amount of compensation being received by you for agreeing to perform the principal's duties.

*Reynolds*, 856 P.2d 462, 463 (Alaska 1993); *Manning v. Alaska R.R.*, 853 P.2d 1120, 1124 (Alaska 1993). Kilmer was notified of his termination by a bill of particulars dated July 5, 1989, and a letter dated July 14, 1989. Neither communication informed Kilmer that the decision was final, or that he had thirty days to appeal. Under these circumstances, the trial court correctly waived the thirty-day limitation, assuming it applied.

### C. *Merits of the Board's Decision*

■ The trial court held that Kilmer was discharged for good cause.[7] The trial court's factual findings are reviewed using the clearly erroneous standard. Alaska R.Civ.P. 52(a). To reverse, we must have a

8. The contract addendum you drafted [Addendum Two] ... did not accurately reflect the intentions of the School Board. Moreover, while you stated you would have the contract addendum reviewed by School District counsel, you did not....
9. The contract addendum you drafted [Addendum One] ... did not reflect the intention of the School Board. Moreover, while you stated you would have the contract addendum reviewed by School District counsel, you did not....
10. Because of your conduct, the School Board and the community of Dillingham have lost confidence in your ability to adequately carry out the responsibilities of the superintendent ... making you unable to adequately perform the functions of the superintendent's position.

All but three of those reasons (four, five and six) concern the manner in which Addendum One and Addendum Two were added to the contract. The trial court found that reasons four and five, alleged failure to conduct and ensure the completion of performance evaluations, did not create good cause for termination. Although there was some truth in the allegations, extenuating circumstances existed in both instances. None of the Board members testified that these actions resulted in their lack of trust in Kilmer. We agree with the superior court that reasons four and five do not constitute good cause. Given our conclusion that the Board had other legitimate reasons to terminate Kilmer, it is not necessary for us to decide whether the superior court clearly erred in finding that reason six was an insufficient justification for termination.

We further note that the trial court ordered that because of inaccurate and untimely responses to Kilmer's request for admissions, the District had admitted that Kilmer did not violate Department of Education regulations in preparing the contract addenda as alleged in reason two.

definite and firm conviction that a mistake has been made. *City of Hydaburg v. Hydaburg Coop. Ass'n,* 858 P.2d 1131, 1135 (Alaska 1993). In determining whether a mistake has been made, we "take the view of the evidence most favorable to the prevailing party below." *Parker v. Northern Mixing Co.,* 756 P.2d 881, 891 n. 23 (Alaska 1988) (quoting *Graham v. Rockman,* 504 P.2d 1351, 1353–54 (Alaska 1972)). The court's legal conclusion is reviewed independently. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979). Our duty is to "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Id.*

### 1. *Trial court's factual findings*

The trial court found that Kilmer had made the following six "serious errors" in dealing with his own compensation:

a. He procured the Board's approval of addenda to his own contract without first obtaining legal review of the addenda.

b. He misled the Board into believing that he was seeking to cash in leave time for *past* unused leave only, rather than past and future unused leave.

c. He presented the Board with no dollar amount for the leave for which he proposed to receive pay.

d. He led the Board to understand that his principal's pay would be in the amount of $30,000, or if his testimony is believed, $30,000 to $40,000, and then failed to return to the Board and advise Board members that the amount actually approximated $50,000.

e. He represented that the principal's compensation would in fact be used to buy back years in the retirement system, allowing the Board to explain the compensation to the community in terms of a retirement benefit. He then failed to contribute the funds received to TRS and took the funds in advance of his having earned them, although the rationale for doing so (the accrual of interest on the TRS contribution) no longer existed.

f. He drafted contract addenda that did not reflect the Board's intentions (based on his own representations) regarding these compensation matters.

The trial court found that Kilmer's "wrongful actions" constituted incompetency under the statute and justifiably caused the Board to lose trust in him.[8] We find that the trial court's findings on Kilmer's most serious errors, those relating to his unused leave and principal's compensation, are not clearly erroneous.[9] We note that "great weight must be accorded to the trial judge's experience and to [the] evaluation of demeanor testimony." *Sheridan v. Sheridan,* 466 P.2d 821, 824 (Alaska 1970). When the trial judge's decision is dependent largely upon oral testimony of the witnesses seen and heard by the court, this court must give due regard to the trial judge's opportunity to judge the credibility of those witnesses.[10] Alaska R.Civ.P. 52(a); *Parker,* 756 P.2d at 892; *Kenai Power*

**8.** Although those findings are found in the trial court's "conclusions of law," we find that these are findings of fact that must be reviewed under the clearly erroneous standard. It is of no consequence what label the trial court has attached to its findings. *Urban Dev. Co. v. Dekreon,* 526 P.2d 325, 328 (Alaska 1974).

**9.** Kilmer argues that finding (a) is clearly erroneous because there is no evidence Kilmer had a duty to have a lawyer review the addenda. We agree. However, we find that finding (a) is of minor importance in relation to the court's other findings.

**10.** The dissent argues that this court "accepts" the trial court's characterization of the case: that Kilmer was terminated after he pulled the "wool over the eyes" of "an insufficiently sophisticated group of people. . . ." Dissent at 775. The court has accepted no such characterization, nor does this opinion rest on such a proposition. Further, the trial court never stated that the Board members were insufficiently sophisticated to act, implied that they were unsophisticated, or stated that its decision was based on any such characterization. It noted that "a more sophisticated group of people may (or may not) have been able" to draw certain distinctions, but it elsewhere referred to "missteps of exceptionally well intentioned and competent people." In context of the latter comment, the first comment cannot be read to imply that Board members were unsophisticated or not sophisticated enough to run the school district. We reject any possible implication that Kilmer's transgressions should be excused because a more knowledgeable Board would have prevented him from doing anything objectionable.

*Corp. v. Strandberg,* 415 P.2d 659, 660 (Alaska 1966).

### a. *Unused leave*

█ The trial court did not clearly err in finding that Kilmer misled the Board into believing that he was seeking to cash in leave time only for past unused leave time. Addendum One states that Kilmer's contract was changed to allow "the use or reimbursement of all unused leave days at any time." The testimony of the Board members makes it clear that they believed Kilmer wanted to cash in past unused leave that had resulted from his administration of a school construction project. The Board believed it was authorizing a one-time cash-in and was never told of the cash value of the leave Kilmer had accumulated.[11] There is no indication in the record that the Board received information about Kilmer's leave time other than through Kilmer. Therefore, we find that the Board's testimony supports the trial court's finding that Kilmer misled the Board.

█ Although Kilmer admits that he never presented the Board a dollar figure for his leave, he argues that Addendum One is clear on its face and that it was the Board's responsibility to figure out what it was authorizing. An assumption that the Board must share the responsibility does not absolve Kilmer of his share of responsibility.[12] Because it believed it was getting the necessary information from Kilmer, the Board had no reason to investigate further. He wrote the ambiguous language in Addendum One and he cashed in more leave than initially authorized. A reading of the record does not leave the clear impression that a mistake was made by the trial court.

### b. *Principal's pay*

█ We also find that the trial court did not clearly err in making findings concerning the additional compensation for the principal position. The trial court found that the Board believed Kilmer's additional compensation would be approximately $30,000, and that it would be used to buy back years in the TRS. It also found that Kilmer was paid nearly $50,000 and that he did not use that money to purchase back retirement years, but instead invested it in an Oregon travel agency.

Kilmer argues that the court's findings are clearly erroneous because Addendum Two clearly stated that the amount of compensation would be "based" on a retirement buy back but did not require Kilmer to put the money into the TRS. Additionally, he argues that it was the Board's responsibility to establish the precise amount and that the two checks (totalling $49,581) were signed by a Board member. He also cites the fact that he returned the amount over $30,000 when "it became clear to [him] that there was confusion."

█ The Board is not without responsibility, but its actions do not absolve Kilmer of the consequences of his conduct. A party is bound not by the outer limits of an ambiguous document, but by the terms agreed upon by the parties. *See, e.g., Stepanov v. Homer Elec. Ass'n,* 814 P.2d 731, 734 (Alaska 1991) (giving effect to the reasonable expectations of the parties). Kilmer argues that the court's finding is clearly erroneous because the language of Addendum Two permits the actions he took. However, Kilmer's actions exceeded the agreement reached with the Board. In addition, he fails to explain why he failed to invest in the TRS or inform the Board that the resulting payments would substantially exceed $30,000. As the trial court pointed out, the rationale for two lump-sum payments was specifically tied to the TRS investment. We agree with the trial court's finding that Kilmer erred in not informing the Board that he was to receive nearly $50,000 and that he did not plan to put the money into the TRS.

The trial court found that as a result of his errors, "Kilmer lost the trust of the School Board." The court further found that the

---

11. Kilmer obtained a total of $19,200 in cashed-in leave in 1988. He cashed in another $5,100 during 1989.

12. The trial court found that the Board was partially responsible for the events leading to this case. When deciding whether there is good cause for termination, however, it is primarily Kilmer's conduct that must be analyzed.

Board was justified in this response to Kilmer's wrongful actions. Kilmer argues that this conclusion is erroneous because "the majority of the Board did not proceed as though it had lost the trust of Kilmer, nor did attorney Fossey." However, the trial court determined that Board members could "reasonably question whether Kilmer was presenting them with all of the facts necessary for their decision making and whether he was implementing their decisions according to their intentions." The trial court concluded that the Board lost confidence not in Kilmer's administrative abilities but in his "integrity and reliability." The testimony of the Board members clearly supports the court's findings that the Board no longer trusted Kilmer on those issues and that this loss of trust was justified.

### 2. *Trial court's conclusions of law*

Having upheld the trial court's dispositive findings of fact, we must next determine whether the court was correct in concluding that Kilmer's errors constitute good cause for termination under Kilmer's contract. Kilmer's contract stated that Kilmer could be terminated for "good cause." The contract defined good cause to "include, but not be limited to the grounds set forth in [AS] 14.20.170."[13] During litigation, the parties stipulated that good cause under the contract would include the statutory grounds (incompetence, immorality, and non-compliance with the law) as well as "similar offenses."

The trial court concluded that Kilmer's actions constituted "incompetency" under the statute because his miscommunications with the Board were a failure to perform his duties adequately and that the Board's loss of trust "rendered him unable to perform his customary duties adequately." Alternatively, the trial court concluded that Kilmer's actions in addressing his own compensation matters suggested a breach of fiduciary duty that constituted a "similar" ground for good cause discharge.

Kilmer argues that the trial court erred in concluding that loss of trust equates to incompetence. He argues that "lack of trust is not necessarily incompetence" and that "loss of confidence and just cause do not always equate."

Kilmer is correct in his assertion that the Board could not terminate a superintendent merely by asserting it "no longer trusts" the superintendent. The lack of trust must be reasonably based on the superintendent's improper actions; the unsupported subjective beliefs of the Board would be insufficient to warrant termination. In this case, however, the trial court concluded that given Kilmer's actions in misleading the Board in regard to his compensation, "the Board was justified in losing trust in Kilmer." The trial court went on to reason in the alternative that Kilmer's "serious errors" were suggestive of a breach of fiduciary duty to the Board "in a situation rife with conflict of interest." The trial court's conclusions in this regard do not constitute error.

One of the superintendent's primary responsibilities is providing professional leadership to the Board. The District's policy manual states that, among other duties, the superintendent

> [p]repares and submits to the board recommendations relative to all matters requiring action by the board, placing before the board such necessary and helpful facts, information, and reports as are needed to insure the board's acting in full possession of all relevant data.

Dillingham City Schools Board (DCSB) Policy Manual § 2.7.5 (rev.1989).

If the Board no longer trusts the superintendent, this duty cannot be performed adequately. Although the superintendent may be able to complete this function satisfactorily, if the Board perceives that the superintendent may be hiding or shading necessary facts, the relationship is no longer functional.[14]

---

**13.** *See, supra* note 1.

**14.** The relationship between superintendent and school board requires a high level of confidence and trust. If the superintendent causes this close relationship to disintegrate, then he or she is no longer able to function as superintendent. *Wedergren v. Board of Directors*, 307 N.W.2d 12, 22 (Iowa 1981).

Furthermore, as the trial court noted, the Policy Manual also adopts the code of ethics adopted by the Association of School Administrators. That code requires an administrator to "[honor] the public trust of his position above any economic or social rewards" and "not permit considerations of private gain nor personal economic interest to affect the discharge of his [/her] professional responsibilities." DCSB Policy Manual §§ 2.4.7, 2.4.8. The trial court's findings that Kilmer misled the Board about cashing in leave time and about the principal's compensation each involved matters of direct economic benefit to Kilmer. It was not unreasonable for the Board to expect Kilmer to provide accurate and complete information concerning these matters.

Kilmer's response—that the Board had access to accurate information—is inadequate. The Board should not have the burden of investigating each of Kilmer's representations. Even Kilmer admits that one of the superintendent's primary responsibilities is to provide leadership and expertise to the Board. If the Board were required to question the information given to it by the superintendent, the efficiencies in having a superintendent would be substantially decreased.

It is of no importance that Kilmer returned all but $30,000 of the monies he received as compensation for acting as principal. This action may have helped to diminish the public outcry over his salary, but it did not repair the trust that had already been damaged. If Kilmer had originally taken the $30,000 agreed upon, and used it for his retirement as intended, the public's reaction arguably would have been less hostile.

Kilmer argues that the Board is not without blame. This may be true. Nonetheless, in a case that turns on legal issues, rather than equitable considerations (as the trial court correctly observed) the actions of the Board are irrelevant so long as the decision to terminate is based on the actions of the superintendent. The court permissibly found that Kilmer's actions caused the Board's loss of trust. We therefore conclude that the trial court did not clearly err in finding that there was good cause for termination.

## IV. CONCLUSION

For reasons discussed above, we AFFIRM the trial court's decision to waive the thirty-day filing limitation and to conduct a bench trial on Kilmer's claims. We find that the record supports the trial court's dispositive findings of fact and hold that the court correctly applied the law. Therefore, we AFFIRM the court's decision that Kilmer was terminated for good cause under his contract. These conclusions make it unnecessary for us to consider the trial court's pretrial damages rulings.

MATTHEWS and FABE, JJ., concur.

MOORE, C.J., not participating.

COMPTON, J., dissents, with whom RABINOWITZ, J., joins as to Parts I and II.

MATTHEWS, Justice, concurring.

I agree fully with the opinion of the court. I write separately merely to note my disagreement with the conclusion of the superior court that reason six of the bill of particulars does not constitute good cause for Kilmer's termination. Reason six is that Kilmer exercised poor judgment in recommending that he receive pay for another job while he was employed full-time as school superintendent.

Dual office holding with substantially increased compensation is a practice which easily lends itself to abuse. There is much common law, statutory and constitutional authority which prohibits dual office holding by public employees. *See Acevedo v. City of North Pole,* 672 P.2d 130, 133–36 (Alaska 1983); *Begich v. Jefferson,* 441 P.2d 27 (Alaska 1968); *Knuckles v. Board of Education of Bell County,* 272 Ky. 431, 114 S.W.2d 511, 514–16 (1938) (offices of assistant county school superintendent and school principal or teacher incompatible under common law rule prohibiting dual office holding); 3 McQuillan, *Municipal Corporations* § 12.66, .67 (3d rev. ed.1990).

We outlined the underlying purposes of the rule prohibiting dual office holding in *Acevedo, supra* at 134, 135. Among those relevant to the present case are "preventing

multiple position-holding, so that offices and positions of public trust would not accumulate in a single person; [and] preventing individuals from deriving, directly or indirectly, any pecuniary benefit by virtue of their dual position-holding...." A strong and justified public reaction to revelations of dual office holding with substantially increased compensation should reasonably have been anticipated by Kilmer.

FABE, Justice, concurring.

I agree with the dissent's analysis that the trial court improperly characterized this matter as an administrative appeal and that Kilmer thus had a right to a jury trial in a direct action against the Board. However, I join in the conclusion of the court that Kilmer waived his right to a jury by stipulating to a bench trial on all issues. Thus, the trial court's error in holding that Kilmer's action was an administrative appeal is harmless.

COMPTON, Chief Justice, dissenting, with whom RABINOWITZ, Justice, joins as to Parts I and II.

This dispute arises out of a complex series of events, including (1) negotiation of an employment contract between Henry Kilmer and the Dillingham City School District (District), acting through its Board of Education (Board); (2) negotiation of an addendum to that contract regarding the manner of compensating Kilmer for indisputably accrued leave; (3) meetings between Kilmer and the Board resulting in the expansion of Kilmer's duties to encompass the principalship of the Dillingham middle/high school and the negotiation of a second addendum to Kilmer's contract in connection with that undertaking; (4) payments to Kilmer pursuant to those addenda; (5) investigations by the District into the propriety of those payments, none of which determined that any impropriety had occurred; and finally, (6) numerous charges against Kilmer, purportedly substantiating good cause for the termination of his contract. In my view the court does not correctly analyze the factual and legal issues Kilmer raises. The result it reaches is not supportable. Therefore, I dissent.

The fundamental error in the court's analysis stems in part from its threshold conclusion that Kilmer waived whatever right he may have had to a jury, effectively holding harmless the superior court's denial of Kilmer's constitutional right to a trial by jury.[1] Op. at 762. The record does not support that conclusion. This erroneous conclusion leads the court to review and then sustain factual findings on issues which should have been committed to resolution by a jury, not resolution by a superior court judge. Even if Kilmer did waive his right to trial by a jury, my review of the record leads me to conclude the superior court's decision is not supportable.

I. *ADMINISTRATIVE APPEAL*

By concluding that Kilmer waived any right he had to trial by a jury, this court avoids addressing whether the proceeding in superior court was an administrative appeal or a *de novo* direct action in which Kilmer was entitled to trial by a jury. Since I have concluded that this court's waiver analysis is not supportable, it is necessary to address what type of proceeding was held in superior court.

I conclude that the superior court erred when it denied Kilmer the right to initiate a direct action against the District, limiting him instead to an administrative appeal.[2] This court notes that Kilmer waived by contract statutory procedures to administratively grieve [the Board's] decision.[3] Op. at 759.

---

1. The Alaska Constitution preserves the right to trial by jury. Alaska Const. art. 1, § 16.

2. As the separate opinions filed in this case show, three members of this court do not agree with the superior court on this issue.

3. Paragraph 9 of the Dillingham City School District Superintendent's Contract provides in part:

*Superintendent Status.* It is understood by and between the parties that the Superintendent serves at the pleasure of the District. The Superintendent hereby expressly waives any rights as set forth in A.S. 14.20.095 through A.S. 14.20.210, inclusive thereof. In addition, the Superintendent waives any right to any grievance procedures established by the District. Nonetheless, the Superintendent shall have the right to address the Board concerning any aspect of the Superintendent's contract or

It also notes that Kilmer was not contractually bound to any administrative grievance procedure. It further notes that Kilmer was afforded the "right to address the Board concerning ... possible termination of [his] contract." Op. at 759.

The District understood that Kilmer's right to a pretermination hearing was of constitutional dimension, as evidenced by the District's attorney's statement to Kilmer that he "ha[d] a constitutional due process right to notice and a hearing ... regarding [his] termination." [4] The court does not dispute that Kilmer had no statutory right and no school district grievance right to either. His only contractual right was the right to *"address* the Board concerning ... possible termination of [his] contract." Op. at 759 (emphasis added). The *ad hoc* hearing which Kilmer was offered was for the purpose of permitting him to "present any defenses [he] may have regarding [his] termination." [5] Kilmer's contractual right to an audience before the Board, and his constitutional right to notice and a hearing, are not the same.

While an employee may lose the right to trial by a jury in a suit for wrongful termination of his or her employment contract by failing to use a contractual grievance procedure, as long as that procedure is not futile and it affords procedural protections, we specifically limited that holding to such a situation. *Diedrich v. City of Ketchikan,* 805 P.2d 362, 367 (Alaska 1991) ("When an employee enters into a contract that contains grievance procedures, it is not a denial of the right to a jury trial to require the employee to follow those procedures."). The Board did not offer Kilmer a hearing to satisfy any contractual or statutory entitlement; he had none. The hearing he was offered was an *ad hoc* remedy compelled by his constitutional due process rights.

Kilmer's situation is unlike that of a terminated teacher, who has no right to a trial by jury or to sue for wrongful termination. *Fairbanks N. Star Borough Sch. Dist. v. Duncan,* 878 P.2d 641 (Alaska 1994) ("No right to trial by jury attaches to an action for a statutory remedy unless the statute so provides or the statutory remedy is a codification of a common law remedy."). Kilmer's contract barred all the administrative remedies available by statute to teachers.

The case which presents a situation most analogous to Kilmer's is *Casey v. City of Fairbanks,* 670 P.2d 1133 (Alaska 1983). The terms of Casey's employment with the City of Fairbanks (City) were set forth in a collective bargaining agreement between the City and Casey's union. The agreement provided a five-step grievance procedure for resolving employee grievances. Casey was fired and attempted to avail himself of the grievance procedure. However, the union declined to pursue the grievance. The agreement contained no provision that ensured enforcement of the grievance procedure. Casey filed suit in superior court for wrongful discharge. The City moved to dismiss Casey's suit, claiming *inter alia* that Casey had failed to exhaust his contractual remedy.

In *Casey* we acknowledged that "an employee must first exhaust his contractual or administrative remedies, or show that he was

concerning possible termination of the contract.

4. The District's attorney's letter to Kilmer commenced with the statement that "[y]ou are hereby notified that you are dismissed." It set forth the Board's reasons for so doing, and then advised Kilmer that

In the contract ... you expressly waived any statutory rights set forth in AS 14.20.095 through AS 14.20.210, inclusive thereof. Nevertheless, under Alaska law you have a constitutional due process right to notice and a hearing before the School Board to present any defenses you may have regarding your termination. If you would like a hearing before the Dillingham City School Board regarding your termination, please notify the School District in writing within five (5) days from the day you receive this letter.

The letter does not suggest that the Board might bear the burden of proving the charges, or that Kilmer might be entitled to a hearing before a tribunal consisting of persons other than those who themselves made the charges.

5. The due process guarantees in the Alaska and United States constitutions give public employees a right to notice and a hearing before they can be dismissed. *Odum v. University of Alaska,* 845 P.2d 432, 434 (Alaska 1993); *Storrs v. Municipality of Anchorage,* 721 P.2d 1146, 1148–51 (Alaska 1986), *cert. denied,* 479 U.S. 1032, 107 S.Ct. 878, 93 L.Ed.2d 832 (1987).

excused from doing so, before he may pursue a *direct action* against his employer." *Id.* at 1136 (citations omitted; emphasis added). We concluded that Casey was excused from pursuing his contractual remedy, as a matter of law, because it would have been futile. He was permitted to maintain a *direct action* against the City.

We had no occasion to determine whether Casey had a right to a trial by jury; the issue was not before us. However, we did determine that Casey was permitted to bring a *direct action* against his public employer, because he had no other effective remedy. Kilmer's position is little different. Although the Board gave Kilmer due process notice of *its* charges against him, and offered to give him a due process hearing *before it* to permit him to present any defenses he had to the charges it had brought, the fact remains that Kilmer had no statutory or contractual rights that he could enforce. There were no procedures established for adjudicating the charges, and there was no effective way for Kilmer to contest the District's action except by a direct action. Wrongful termination (breach of contract) is a remedy known at common law. Neither contract nor statute proscribed Kilmer's right to bring a direct action against his employer for breach of contract. Neither contract nor statute limited Kilmer's remedy to an administrative proceeding and an administrative appeal. The fact is that Kilmer's employer fired him for reasons it specified in a letter of termination. The employer made no administrative determination regarding its reasons, nor did it ever act in an adjudicative capacity. There has never been any administrative determination regarding the proffered reasons. Kilmer had the right to have this determination made by a jury.

## II. *WAIVER*

This court concludes that Kilmer waived any right to trial by a jury. Op. at 762. Because of the waiver, the court is able to avoid addressing whether Kilmer and others

similarly situated nonetheless have a right to trial by a jury.

The court bases its conclusion that Kilmer waived his right to a jury trial on three documents. Op. at 762–63. However, the court fails to provide any context within which these documents originated. A review of the context is necessary to understand why the conclusion that Kilmer waived his right to a jury trial is not supportable.

Kilmer's original complaint contained both contract and tort claims,[6] and was accompanied by a Demand for Jury Trial, which "request[ed] and demand[ed] a trial by jury on all issues triable of right by jury." The District's first affirmative defense was that Kilmer had failed timely to administratively appeal his termination as required by AS 44.62.330–630 and Appellate Rule 602.

Kilmer moved for partial summary judgment on the District's first affirmative defense, arguing that his action was not an administrative appeal. Almost contemporaneously the District moved for summary judgment, seeking dismissal of Kilmer's claims for "wrongful termination" on the ground that "those" claims constituted an administrative appeal. Each opposed the other's motion, and replied to oppositions, essentially spilling a lot of ink on the same issue. However, Kilmer raised as one of his concerns the issue of his entitlement to a jury trial.

In ruling on these motions the superior court granted each in part and denied each in part. It concluded that Kilmer should have filed an administrative appeal and that he had not done so timely, but that his failure was excused. The court "converted" the case to an administrative appeal, and ordered Kilmer and the District to comply with Appellate Rule 602. Two weeks after the court entered its order, it entered a pre-trial order which declared that the case was "Non–Jury."

Kilmer complied with the superior court's order, filing a Notice of Appeal which stated that he was appealing "from the agency deci-

---

**6.** Kilmer alleged breach of contract, breach of the covenant of good faith and fair dealing, defamation, intentional interference with prospective contractual relationships and business opportunities, negligent interference with prospective business opportunities, and invasion of privacy.

sion, a letter to Kilmer from Dillingham City School District called a 'Bill of Particulars.'" This notice set forth not only Kilmer's contract claims, which had been the only subject of the motions, but also his tort claims. It also incorporated by reference his original complaint, which had asserted both, and attached the original complaint as an appendix. The Notice of Appeal was accompanied by a Request for Jury Trial. The District promptly objected to Kilmer's request, asserting that "[t]his matter has already been designated an administrative appeal to be heard by Judge Joan Katz." On October 14, 1992, the court denied Kilmer's request for jury trial, without waiting for or requesting any response from Kilmer. The next day the District's attorney filed a "Notice" advising the court that despite the court's order sustaining its objection to Kilmer's request for a jury trial, the objection was being withdrawn.[7] The purported withdrawal bears a handwritten and initialed notation: "Moot upon review by the CT 10–21–92."

At this point, Kilmer's only claims that had been put in issue by pleadings and supported by memoranda were his contract claims. His tort claims had not been the subject of motions, and there was no reason for him to believe that they were not viable. When the superior court "converted" the case to an administrative appeal, it did not differentiate between the contract and tort claims, or dismiss either. There would be no reason for Kilmer to believe that he had been deprived of a jury trial on the tort claims, except for the noted pre-trial order which stated that the case was "Non–Jury." The order itself did not differentiate between the contract claims, erroneously declaring them to be the subject of an administrative appeal, and the tort claims, which were not. Kilmer's reassertion of his demand for a jury trial must be viewed in light of that order. There would be no right to a jury trial on an administrative appeal of the contract claims, though there would on the tort claims. By reasserting his demand for a jury trial, Kilmer would

be assured that he had not waived his right to a jury trial on the tort claims.

The District objected to Kilmer's demand for a jury trial, an objection which the superior court sustained. The court again did not differentiate between contract and tort claims. When the District attempted to withdraw its already sustained objection, it did not differentiate either. The uncontroverted evidence in the record is that the purported withdrawal was "moot," evidenced by the court's notation on the purported withdrawal. There is nothing in the record to suggest that Kilmer would or should have assumed that by virtue of the attempted withdrawal, he was being given the opportunity to have his contract claims decided by a jury. The focus of the issues to that point had been on contract claims in the context of an administrative appeal.

On December 17, 1992, Kilmer filed a notice of hearing on pending motions, scheduling the hearing for January 21. On January 19 the court mailed the notice of hearing to the attorneys. The notice contained a handwritten notation from the trial judge that "[i]n addition, the court will inquire as to the parties' intentions to present *all* issues to a jury despite the lack of authority to do so on an administrative appeal . . . ." (emphasis in original). On January 21, Kilmer's counsel, with the District's consent, wrote the trial judge regarding matters "which may assist with preparation for oral argument today," one of which was "1. The parties are in agreement that all Kilmer's claims may be tried before the court in a judge-tried case." The record does not disclose whether either attorney had received the court's notice prior to transmittal of this letter.

It is these last two documents which, together with the District's attempted withdrawal of its objection to the Request for Jury Trial, comprise the three documents the court concludes establish an express waiver of the right to a jury trial. Again, context is important. The superior court had denied Kilmer's request for jury trial, at least as far

7. The District does not rely on this Notice to establish a waiver. This is understandable, since litigants cannot unilaterally overrule a court's decision. The superior court did not respond directly to the District's Notice, rather it noted that the Notice was moot. Nonetheless, this is one of the three documents on which this court relies in concluding that a waiver occurred.

as the contract claims were concerned, on the basis of the District's objection. The District's purported withdrawal of that objection was noted by the court to be moot. The court was faced with a proceeding which was in part an administrative appeal of contract claims, in part a conventional civil suit asserting tort claims distinct from the administrative appeal. The court wanted to "inquire as to the parties' intentions to present *all* issues to a jury, despite the lack of authority to do so on an administrative appeal." The court did not ask for further argument on its prior decision sustaining the District's objection to Kilmer's request.

Assuming Kilmer's letter to the trial judge was in response to this question, it was answered by the statement that "all Kilmer's claims may be tried before the court in a judge-tried case." Kilmer's agreement can be viewed as no more than his concession that since the contract claims were to be tried to the court, the tort claims might as well be also, just as easily as it can be viewed as a waiver of his right to a jury trial. Kilmer agreed that "all" claims could be tried to the court, not just the contract claims which the court had already ordered must be tried to the court.

This court narrows its focus to two of the documents:

> Were it not for Dillingham's filing of a withdrawal of its opposition and the trial court's subsequent order, which emphasized that the parties should be prepared at the pre-trial hearing to address the propriety of a jury trial on *all* of their claims, Kilmer's counsel's letter could be construed as ambiguous.

Op. at 762 (emphasis in original). The court's error is two-fold. First, the superior court already had sustained the District's objection to the jury request when the District filed its attempted withdrawal of the objection. The superior court noted that the notice of withdrawal was "[m]oot upon review by CT 10–21–92," which may be why the District does not attach any significance to this document.[8] Second, the superior court did not ask the parties to "address the propriety of a jury trial" at the hearing. It stated that it was going to "inquire as to the parties' intentions to present *all* issues to a jury despite the lack of authority to do so in an administrative appeal...." The superior court had already held once, arguably even twice, that Kilmer did not have any right to a jury trial on the contract claims. The only way this court can justify its conclusion is to hold that the announced inquiry noted on the notice of hearing was (1) a ruling by the superior court that it was vacating its prior ruling that Kilmer did not have the right to a trial by jury on the administrative appeal, and (2) an acknowledgment by the superior court that Kilmer did possess such a right. Only then could this court suggest that Kilmer had waived his right to a jury trial by agreeing that all claims could be tried to the court.

Had the superior court made the correct ruling to begin with, Kilmer would have been before a jury on both his contract claims and his tort claims. Since no issue had ever been made of Kilmer's right to present his tort claims to a jury, there is no reason to suggest, much less conclude, that by waiving his right to present his tort claims to a jury, Kilmer was conceding, and thus waiving, his right to present his contract claims to a jury, or later claim that the superior court erred in denying him that right. The superior court had ruled that he had no such right because those claims had to be brought as an administrative appeal. He should not be held to have intentionally waived a right the court already ruled he did not have.

**8.** In footnote 12 of the District's Brief of Appellee/Cross–Appellant, the District asserts that "Kilmer concedes that he agreed to waive trial by jury. Kilmer Brief at 24, note 37."

Note 37 states:

Kilmer filed a Notice of Appeal, Statement of Points on Appeal, and Request for Jury Trial.... The District objected to the jury trial request, based on Kilmer's case being designated an administrative appeal, and the court denied Kilmer a jury.... After that, the parties agreed to waive jury trial as to Kilmer's remaining claims, which were not part of the administrative appeal.

Kilmer and the District may disagree on what was intended by Kilmer's waiver. However, the District's representation of Kilmer's waiver is patently wrong.

## III. *THE BILL OF PARTICULARS*

The factual allegations contained in each separate reason identified by the District in its termination letter to Kilmer, later denominated Counts in a Bill of Particulars, were required to be proven by the District by a preponderance of the evidence, according to the superior court.[9] This court notes that the factual findings relating to the Counts in that document should be reviewed under the "clearly erroneous" standard. Op. at 763–64. The resulting legal justifications, or conclusions, should be reviewed *de novo*. Op. at 764.

The Bill of Particulars set forth ten [10] specific Counts containing allegations of misconduct, and informed Kilmer that based on these allegations he was

> being dismissed ... because the [ ]Board has lost confidence in your ability to perform the customary administrative duties of the superintendent's position in a satisfactory manner. In addition, you have substantially not complied with the policy manual of the district.

In other words, the District's action was justified because (1) the Board lost confidence in Kilmer's competence as defined by AS 14.20.170(a), and (2) Kilmer had exhibited good cause for discharge as expressed in AS 14.20.170(c) ("substantial noncompliance" with laws or rules regarding education).

Although this court does not directly address the point, it and the superior court collectively have held that most of the factual allegations in the Bill of Particulars were either false or insufficient to support a good cause termination. To the extent that the superior court acknowledged Count 1 of the Bill, it deemed Kilmer's actions a "less serious" error which did not justify termination.[11] It found that Count 2 was false. It found that Counts 4 and 5 were essentially pretextual reasons for terminating the contract, since they contradicted the Board members' unanimous testimony that they had no complaints with Kilmer's administration of the District's educational programs. The superior court also rejected Count 6 as a ground for termination of the contract. Finally, this court effectively negates half of Counts 8 and 9, noting that there is no evidence that Kilmer had a duty to obtain review of the addenda to his contract.[12] Op. at ——. To this list of rejected charges I would add Count 3, which the record shows to be false.[13] In sum, Counts 1 through 6 and half of Counts 8 and 9 of the Bill of Particulars have been or should be set aside either as factually unsupported by the record or legally insufficient to constitute good cause for terminating Kilmer's contract.

What Counts remain to support the Board's decision and the superior court's examination of that decision? The factual allegations contained in Count 7, and parts of Counts 8 and 9, contain the following charges: (1) Kilmer misrepresented the amount of compensation to be received by

---

9. See *Johns v. Commercial Fisheries Entry Comm'n*, 758 P.2d 1256, 1260 (Alaska 1988) ("We have adopted a rule that agency decisions, in the exercise of their adjudicative powers, must be accompanied by written findings and a decisional document."). There are neither written findings nor a decisional document in this case, because (1) there was no hearing from which they might be generated, Kilmer having waived the *ad hoc* due process hearing, and (2) there is no citation to any authority suggesting that the Board had or was exercising any adjudicative powers with respect to Kilmer.

10. Count 10 is a reiteration of the first justification for terminating Kilmer's contract, i.e., the "loss of confidence" in his ability to carry out the responsibilities of superintendent.

11. The superior court does not list Kilmer's failure to record the meeting as a factor relevant to the Board's loss of faith in Kilmer. Moreover, the Board's attorney, in his report exonerating Kilmer of wrongdoing, found that tape recording the meeting was not required under Alaska law or under the District's policy manual.

12. These Counts accuse Kilmer of stating that he would obtain review, and then failed to do so. This assertion is not borne out by the minutes of any Board meeting, however, and the superior court made no such factual finding.

13. The District's policy manual required the signature of a Board member and an administrator on each check. There is no question that Kilmer's checks, which were signed by Board member Wiggins and Kilmer himself, met this requirement. The District's attorney found no fault with the checks issued to Kilmer.

him for performing the principal's duties; (2) Addendum One, drafted by Kilmer, did not reflect the intentions of the Board; and (3) Addendum Two, also drafted by Kilmer, did not reflect the intentions of the Board.

Additionally, one of the Bill of Particulars' two legal justifications for dismissing Kilmer was implicitly rejected by the superior court. The District claimed that Kilmer was subject to discharge for "substantially not compl[ying] with the policy manual of the district." The superior court found, however, that neither of the items in the Bill alleging policy manual violations constituted grounds for discharge. It also found that "Kilmer did not violate Department of Education regulations as alleged in Bill of Particular No. 2." Like the District's own attorney, the superior court found no violations of the policy manual, and the Board did not appeal these findings. Thus despite this court's implication to the contrary, there are no grounds to explain Kilmer's discharge in terms of violation of the District's policy manual.

The Bill of Particulars is reduced to the assertions found in three Counts, which purportedly support the legal justification for Kilmer's termination:

> [As a result of the described] conduct, the School Board ... lost confidence in [Kilmer's] ability to adequately carry out the responsibilities of the superintendent ... making [him] unable to adequately perform the functions of the superintendent's position.

Assuming that the standard of review should be that applied to a bench trial, the superior court's findings with reference to these remaining assertions should be scrutinized to see if they are clearly erroneous, and if not, whether indeed they provide grounds for Kilmer's good cause discharge.

This court does not follow this method of analysis, however. It reviews the superior court findings, see Opinion, Part III.C.1.a.-f., only half of two of which directly address assertions set forth in the remaining Counts

of the Bill of Particulars,[14] and treats them as if they constitute independent justification for the Board's decision to terminate Kilmer's contract. They are relevant only to our determination whether the assertions contained in the remaining Counts are based on findings that are not clearly erroneous, and if so, whether they constitute good cause for termination. This court incorrectly treats them as if they have independent significance, and by themselves supply legal justification for Kilmer's termination.

In my view, there is insufficient evidence to support the assertions contained in the remaining Counts. In part the facts that arguably support them are clearly erroneous. Count 7 alleges that Kilmer "misrepresented the amount of compensation being received by [him] for agreeing to perform the principal's duties." The factual finding set forth at Opinion III.C.1.d. arguably addresses this allegation. However, it does not contain any finding that Kilmer "misrepresented" the amount. When addressing the Board regarding this matter, "[h]e led the Board to understand" that his pay, i.e. the cost of TRS buy-in, would be $30,000, or "if his testimony is [to be] believed, $30,000 to $40,000...." It is clear that the figure was an estimate. It was only after the District's own Business Manager referred to an outdated TRS report that the actual amount was determined. Although the superior court found that Kilmer "led the Board to understand" what the amount would be, it did not find that Kilmer himself knew that the amount was greater than the estimate, or that he should have known that the amount was greater. The superior court faults Kilmer for "fail[ing] to return to the Board and advise [it] that the amount actually [was higher]." That is not the assertion contained in Count 7.

The viable halves of Counts 8 and 9 allege that "[t]he contract addendum you drafted [Addendum Two and Addendum One respectively] ... did not reflect the intention of the School Board." These are addressed in a conclusory statement set forth at Opinion III

---

14. These findings respectively state that Kilmer erred several ways: by leading the Board to mistakenly believe that he intended to cash in only past and not future unused leave; by not presenting the Board with the dollar amount of his unused leave; and, by taking his principal's compensation in advance, failing to use the money to buy back retirement.

C.1.f.: "[Kilmer) drafted [contract] addenda that did not reflect the Board's intentions (based on his own representations) regarding these compensation matters." Facially this statement hits its mark. However, standing alone neither of these assertions should be deemed sufficient to provide legal justification for termination of Kilmer's contract. First, this statement only reiterates the assertions contained in the first sentences of Counts 8 and 9; it does not provide any subsidiary findings on how the addenda did not reflect the intentions of the Board. Second, the evidence before the superior court from the accounting firm retained by the Board was that the language of Addendum Two was authorized by the *motion* which the Board approved, and that payments to Kilmer were consistent with a reasonable interpretation of Addendum Two. This court notes that "[t]he accountants, however, were not asked to determine if the language of Addendum Two reflected the Board's intent," Op. at 760, suggesting that Kilmer thwarted the Board's intent through his draftsmanship. Yet it was the motion that supplied authority for Addendum Two. The parties have not argued that the motion did not convey the Board's intent, or that Kilmer sat silently by, permitting the Board to compensate him in a manner he knew was not contemplated.

In regard to Addendum One, three cash reimbursements for unused leave days were made in 1988, the last on June 23. These totaled $19,200. There was no issue regarding these cash reimbursements until June 6, 1989, almost one year later, when Kilmer cashed in an additional $5,100. Only then, after the compensation dispute had erupted, did these cash reimbursements become an issue. As stated, no factual findings indicated that this addendum did not reflect the Board's intentions, as embodied in the motion which the Board adopted.

## IV. *THE RECORD DOES NOT SUPPORT TERMINATION.*

The superior court observed:

[T]he Board's conduct does not negate the fact that Kilmer's wrongful actions gave rise to the entire series of events. Irrespective of its own lapses, the Board was justified in losing trust in Kilmer. Board members could reasonably question whether Kilmer was presenting them with all the facts necessary for their decision-making and whether he was implementing their decisions according to their intentions. A more sophisticated group of people may (or may not) have been able to distinguish Kilmer's actions in connection with the narrow area of his compensation from his otherwise competent performance. But human nature does not necessarily allow for such "rational" categorization.

This court tacitly accepts the superior court's account of this case, which I believe reasonably can be read to say that an insufficiently sophisticated group of people, the Board, had the wool pulled over its eyes by its professional chief administrator. Then, when the Board members realized that they had been duped, they justifiably terminated the man who had violated their trust. This characterization of the events and participants is not borne out by the record.

First, as the superior court noted, "it is ultimately the Board's responsibility to set the compensation for its superintendent."[15] Second, there is no dispute that Kilmer's contract addenda were approved on more than one occasion by the Board, and that Kilmer did not act contrary to the language contained in the addenda. Third, Board members disagree on whether it was one of

---

**15.** The court implies that Kilmer's actions breached that part of the District policy manual that requires the superintendent to "plac[e] before the Board such necessary and helpful facts, information, and reports as are needed to insure the board's acting in full possession of all the relevant data." That general provision of the manual does not speak to the issue of the superintendent's compensation, however. In regard to compensation, the manual explains that the superintendent's usual advisory duties are suspended; he need not even be present at meetings which pertain to his employment and compensation. These provisions do not absolve the superintendent of responsibility for misrepresentation in matters pertaining to compensation. But as discussed *infra*, the record does not support the proposition that Kilmer engaged in misrepresentation.

them or Kilmer who first suggested the possibility that he assume the duties as principal. Fourth, Board members do not agree whether Kilmer's additional salary was a fixed sum, a sum equal to about one half of the salary paid to the previous principal ($60,000), or a sum in the range of $30,000 to $40,000, which were figures Kilmer mentioned. Fifth, Kilmer did not know what his retirement figure was, but had to find out from the District's Business Manager after the addendum was negotiated. Sixth, the Board was informed by two accounting firms and its own attorney that the payments Kilmer received were consistent with the addenda. Finally, contrary to this court's assertions, it is not subject to dispute that the Board was informed of each payment to Kilmer. The superior court's conclusion that it was Kilmer's actions that gave rise to the series of events is not supported by the record.

In light of what is not disputed, and what the Board members themselves disagree on, this case can be sketched as follows. The Board took action to modify Kilmer's contract, in the form of Addenda One and Two. These addenda were "approved" when the Board President and Clerk signed them, and then entered into the Board minutes and approved by the Board as a whole. Kilmer then proceeded · in accordance with his amended contract: he cashed in unused leave in accordance with Addendum One; he assumed joint principal/superintendent duties; and, he took principal's compensation in the amount dictated by Addendum Two. The Board knew about each of these actions because a Board member signed Kilmer's checks and the entire Board received monthly finance reports detailing the payments to him. Significantly, in January 1989, after the Board had authorized checks for Kilmer's principal's compensation and for approximately four-fifths of his unused leave, the Board issued a highly positive review of Kilmer. A month later, the Board's decisions provoked public controversy. In response, Board members met privately with Kilmer. They requested, and Kilmer agreed, that he reduce his principal's compensation from the amount dictated by Addendum Two to a flat

$30,000. Kilmer then proceeded in accordance with his contract.

In the next three months, the following events occurred: (1) public disapproval of the Board's decisions continued, fueled by one Board member who raised the possibility of suing Board members as individuals to recover compensation paid to Kilmer; (2) the Board's lawyer investigated the controversy, found Kilmer's actions reasonable, and recommended no action beyond the already-agreed compensation reduction (at the Board President's request, the lawyer drew up a resolution expressing confidence in Kilmer and extending the joint principal/superintendent contract for another year); and (3) Kilmer cashed in $5,100 in unused leave pursuant to Addendum One.

The Board then suspended Kilmer in order to review the results of an accountants' investigation of the payments Kilmer had received. One week later, the stated reason for suspension evaporated when the accountants concluded that Kilmer's compensation was in accord with the Board's decisions. Two weeks later Kilmer's contract was terminated, after a breakdown in negotiations which would have released the Board from the remaining two years of Kilmer's superintendent's contract and given Kilmer an additional year's employment with the District in order to vest his pension.

On this record, it is difficult to understand where this court finds support for Kilmer's "good cause" discharge. Returning to the three Counts of the Bill of Particulars that remain to be reviewed, the record shows that the Board approved of, and in fact was informed of, Kilmer's compensation at every step of the process. It is difficult to see when or how Kilmer "misrepresented" his principal's compensation. The Board engaged in all necessary approvals of Kilmer's contract addenda and authorized the checks he received. What evidence then supports the charge that Kilmer drafted addenda that did not comport with the Board's intent? Even the charge that the Board "lost confidence" in Kilmer's abilities seems unsupported if measured against a reasonableness standard, given the fact that the Board's opinion of Kilmer was positive for months

after he received all the later disputed payments, and that each investigation conducted by the Board found no illegalities or irregularities in Kilmer's compensation.

In sum, the record indicates that the Board's "loss of confidence" was a reaction to public controversy over the Board's decisions and actions regarding Kilmer's compensation. By affirming this discharge, the court has effectively transformed Kilmer's employment status into that of an at-will employee.

It is clear that there was a fundamental misunderstanding between Kilmer and the Board in the matter of compensation. Indeed, at least one member of the Board did not even consider Kilmer's remuneration to be "compensation." There is no evidence that Kilmer understood there was any misunderstanding regarding compensation until a Board member made an issue of compensation, and the public became roused. When that misunderstanding became apparent to Kilmer, he agreed to reduce the amount authorized by Addendum Two to a flat $30,000. It seems equally clear that the Board, faced with public disapproval of its conduct, and a possible lawsuit against its members individually, sacrificed Kilmer to save itself.

I would reverse the decision of the superior court, with directions that it grant Kilmer a trial by jury. In the alternative, it should determine Kilmer's damages.