MAPCO EXPRESS, INC., Appellant,

v.

David G. FAULK, Appellee.

No. S–9500.

Supreme Court of Alaska.

June 15, 2001.

Douglas S. Parker, Dorsey & Whitney, LLP, Anchorage, for Appellant.

Charles G. Evans, Law Office of Charles G. Evans, Anchorage, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

### I. INTRODUCTION

MAPCO Express, Inc. stockpiled snow on its property in south Anchorage, and the snow melt flowed downhill onto warehouse property owned by David Faulk. Subsequently, some areas of Faulk's warehouse suffered damage, and Faulk brought suit against MAPCO for nuisance and trespass. After a bench trial, the superior court found a trespass and awarded $106,815.43 in compensatory damages and an equal amount in punitive damages. MAPCO has appealed this judgment. We conclude that the superior court's factual findings on liability were sufficiently clear and explicit and that these findings were not clearly erroneous. Moreover, because Faulk's offer of judgment was no longer valid once the trial court issued a verdict, we affirm the finding of liability. We reverse the award of compensatory and punitive damages and remand for further proceedings.

### II. FACTS AND PROCEEDINGS

David Faulk owns a warehouse and office building at 8401 Brayton Drive in south Anchorage. On three sides (north, east, and west) the building is almost completely surrounded by asphalt. On the remaining south side, the building borders property owned by MAPCO Express, Inc. The Faulk building sits only a few inches from the property line dividing Faulk's property from MAPCO's property.

On the north side of the Faulk building, there are three dock-high loading bays. This loading area is bounded by retaining walls and paved with asphalt. The loading area is recessed below the level of the warehouse floor; this allows delivery vehicles to load and unload their payloads at the same level as the warehouse floor. The warehouse floor consists of a single concrete slab that varies in thickness from approximately six inches to perhaps as much as twelve inches. Before 1998 this floor was reinforced with steel mesh and rebar leading into the walls of the building.

After purchasing the property in 1993, Faulk made some cosmetic repairs and then leased the building to Odom Corporation until March 1998. Odom Corporation used the facility until March 1998 for warehousing and distribution of food products.

On the MAPCO property is a MAPCO convenience store and gas station. Before 1997 the northern part of the MAPCO lot sat at a higher elevation than Faulk's property. Beginning in the winter of 1992 MAPCO began piling snow plowed from its property, as well as from two other MAPCO convenience stores, on the north side of the MAP-CO property—the side adjacent to the Faulk property. The snow was placed in piles that at one time were approximately ten feet high. Each year, snow and snow melt fell or drained from these piles down the slope toward the Faulk property. Once down the slope, this water pooled against Faulk's building and was trapped there; water was observed there in the late spring seasons of 1994, 1995, and 1996. The water pooled there at a depth that was sometimes between eight and twenty inches.

Faulk first became aware of damage to his property on June 30, 1994, when an Odom employee notified him that the surface of the asphalt loading area, on the north side of the Faulk building, was becoming soft and breaking up, causing difficulties for Odom's delivery vehicles. Faulk suspected that the problem was caused by poor subsurface materials used below the asphalt, but did not repair the problem in June 1994. During the next year the retaining walls in the loading area were observed to be leaning, and the floor of the warehouse just inside the loading doors started to settle.

In June 1995 one of Odom's vehicles broke through the asphalt surface in the loading area and was stuck there. Faulk assisted in freeing the vehicle and commenced repairs of the area. However, while Faulk was excavating this area a stream of water suddenly gushed out from behind a cracked concrete block in the buried wall of the building underneath the loading area; the resulting stream lasted for about five minutes. At this time Faulk suspected that the snow melt water pooled at the southern wall was draining underground and migrating underneath the warehouse, causing the damage to the asphalt and concrete surface and creating the flow observed earlier at the loading area. Faulk observed that as the water streamed out from under the excavated loading area, the level of the pooled water at the southern wall dropped dramatically, such that when the stream stopped, the pool was almost gone.

In July 1995 Faulk contacted MAPCO environmental manager Paul Farnsworth and explained the problem and his suspicions, and requested that MAPCO stop piling snow from other MAPCO convenience stores on the MAPCO property. Faulk completed repairs to the loading area by the fall of 1995 but did not re-asphalt the area at this time.

Despite Faulk's request, in the winter of 1995–1996 MAPCO continued to pile snow from other MAPCO convenience stores on the northern part of its property. Faulk and his office staff contacted MAPCO at least two times in early 1996 to reiterate the request that this piling be stopped. On February 26 Faulk spoke with MAPCO's Farnsworth, and Faulk asked Farnsworth if a permit was required to pile the snow on the MAPCO property. Faulk testified that Farnsworth replied by stating that "if we need a permit I have a permit." Faulk sent Farnsworth a letter restating the request, and explaining the damage and Faulk's suspicions that the damage was caused by the snow melt. After receiving the March 25, 1996 letter, MAPCO ceased piling snow from other locations at the site but failed to remove the existing snow pile.

In the summer of 1996 Faulk's warehouse floor began to develop problems. The floor slab appeared to be settling and developed hairline cracks. By August 1996 the warehouse floor was exhibiting more significant signs of failure, including slump and more cracking. "Voids" consisting of pockets of empty space were found underneath the concrete. Faulk repaired the floor slab in 1996 and again in 1998.

On February 21, 1997, Faulk brought suit against MAPCO, claiming nuisance and trespass. The original trial date was set for October 25, 1999. However, the superior court advanced the trial date to October 14, 1999 sua sponte. On October 13, 1999, the superior court stated that trial would not commence the next day but would be pushed back until December.

On October 18, 1999, Faulk made an Alaska Civil Rule 68 offer of judgment to MAPCO in the amount of $100,000. MAPCO did not initially respond to this offer. On October 25, 1999, the parties were informed by the superior court that the trial would start on October 27, 1999. A bench trial commenced on October 27 and continued through October 29.

The superior court issued its oral verdict, findings, and conclusions on November 1, 1999. The court found for Faulk and awarded $65,856.43 in compensatory damages and an equal amount in punitive damages, plus interest, costs and attorney's fees. On November 5 Faulk filed a motion for reconsideration concerning damages. The court accepted the revised figures in Faulk's motion, and in its December 7 order of judgment, the court awarded $106,815.43 in compensatory damages, $26,387.07 in attorney's fees, $2,237.07 in costs, and $1,841.80 in interest.

Without explanation, the superior court also increased punitive damages to $106,815.43.

After the November 1, 1999 verdict, MAPCO accepted Faulk's October 18 Rule 68 offer of judgment. However, the superior court refused to affirm the accepted offer on the grounds that it was untimely.

MAPCO has appealed the decision below.

III. *STANDARD OF REVIEW*

This appeal requires us to review the superior court's factual findings. We will overturn these findings only if they are clearly erroneous.[1] These factual findings must be "so clear and explicit as to give [us] a clear understanding of the basis for the decision made."[2]

We will review questions of law addressed by the superior court de novo.[3] It is a question of law whether quasi-estoppel applies to bar the plaintiff's claims in this case.[4]

In this appeal, we must review the superior court's interpretation of Civil Rule 68; in so doing, we will exercise our own independent judgment.[5]

Also, we must review the superior court's award of compensatory and punitive damages. The superior court's award of compensatory damages will not be set aside unless it is clearly erroneous.[6] We will overturn the superior court's award of punitive damages only if it is manifestly unreasonable, the result of passion or prejudice, or entered in disregard of rules of law.[7]

IV. *DISCUSSION*

A. *The Superior Court Did Not Err in Finding MAPCO Liable for Trespass.*

The superior court found MAPCO liable for trespass against Faulk. It awarded

1. See *Kilmer v. Dillingham City Sch. Dist.*, 932 P.2d 757, 763–64 (Alaska 1997); Alaska R. Civ. P. 52(a).

2. *Sullivan v. Subramanian*, 2 P.3d 66, 69 (Alaska 2000).

3. See *Hayes v. Bering Sea Reindeer Prods.*, 983 P.2d 1280, 1282 (Alaska 1999).

4. See *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 26 (Alaska 1998).

5. See *Airoulofski v. State*, 922 P.2d 889, 892 (Alaska 1996) (applying standard to superior court's interpretation of other rules of court).

6. See *Pluid v. B.K.*, 948 P.2d 981, 983 (Alaska 1997).

7. See *id.*

Faulk $106,815.43 in compensatory damages and an equal amount in punitive damages. MAPCO argues that we should reverse the superior court's finding of liability and award of damages because: (1) the superior court's factual findings were not adequately clear and explicit; (2) the superior court's factual findings were clearly erroneous; and (3) quasi-estoppel applies to bar Faulk's claims. We reject all of these arguments.

1. *The factual findings on liability were sufficiently "clear and explicit."*

■ MAPCO claims that we must reverse because the superior court's factual findings were not "clear and explicit," as required by Civil Rule 52(a) and our prior decisions.[8]

■ We explained the requirements of Rule 52(a) in *Sullivan v. Subramanian:*

> Under Alaska Civil Rule 52(a), the trial court had a duty, upon completing the nonjury trial, to "find the facts specially and state separately its conclusions of law thereon." This rule required the court to "deal adequately with and state with clarity what it finds as facts and what it holds as conclusions of law. The findings and conclusions should be so clear and explicit as to give the Supreme Court a clear understanding of the basis for the decision made." [9]

If the superior court's findings are not adequate, we must remand the case to the superior court for more explicit findings.[10]

MAPCO claims that the superior court's findings were inadequate because the court failed to comment on (i) the inconsistency between Faulk's trial testimony and a prior written statement and (ii) the fact that Faulk presented no evidence in support of his causation theory.

MAPCO claims that there is an "inconsistency" between Faulk's prior written statement and his testimony at trial. On May 16, 1996, Faulk wrote a letter to the Municipality of Anchorage regarding a tax assessment for his property. In that letter, Faulk claimed that the parking area was constructed using "substandard methods and materials," and that this resulted in the asphalt breakup problems in the loading area that Odom had complained of in 1994 and 1995. MAPCO claims that this prior written statement is inconsistent with Faulk's position at trial, since Faulk's position at trial was that the problems with the asphalt surface of the loading area were caused not by substandard materials, but rather by MAPCO's migrating snow melt. MAPCO claims that it is "impossible" to determine how the superior court resolved this conflict, and that the superior court should have issued findings specifically dealing with this inconsistency.

Secondly, MAPCO claims that the superior court should have commented on Faulk's failure to address MAPCO's expert testimony. MAPCO's two expert witnesses testified that the snow melt could not have caused the damage to the loading area and the warehouse floor. Faulk presented no expert testimony of his own. Instead, he relied on his own testimony and that of his employees to support his theory that the snow melt migrated under the building to cause his damages. MAPCO claims that the superior court should have "explained" why it disagreed with the expert testimony presented by MAPCO.

In response, Faulk argues that the superior court is not required to explain these inconsistencies, and that the superior court's findings are adequate because each of the critical disputes in the case were resolved by these findings.

Faulk is correct: the superior court's findings are "clear and explicit" because the findings are sufficiently detailed to allow review by this court, and because each of the critical disputes in this case was resolved by these findings.

■ Two major principles emerge from our past decisions concerning Civil Rule 52(a). A trial court's findings are sufficiently "clear and explicit" if they (i) allow for meaningful appellate review and (ii) resolve all critical issues and disputes between the par-

---

**8.** *Sullivan,* 2 P.3d at 69.

**9.** *Id.*

**10.** *See id.* at 72.

ties.[11] We will remand for more detailed findings only if these standards are not met.

The superior court's findings are sufficiently detailed to allow for meaningful appellate review. Superior Court Judge John Reese found that MAPCO committed a trespass by allowing snow melt to invade Faulk's property. The superior court further found that the water from the snow melt migrated under Faulk's building and made the surface of the loading area unstable; when the block under the loading area broke open, this water flowed out of the block with sufficient volume to create "channels" under the warehouse floor, causing voids to form that subsequently caused the floor slab to fail. Finally, the superior court found that the costs of the repairs undertaken by Faulk were "directly caused" by the flow of water from MAPCO's property.

MAPCO cites this court's decision in *Murray v. Murray*[12] in its attempt to show that the trial court here issued incomplete factual findings. MAPCO claims that this case and *Murray* are similar because in both cases the trial court did not fully reveal its reasoning and the appellate court was unable to apply meaningful review. *Murray* was a divorce and property division proceeding in which the lower court awarded the wife some of the husband's separate property without valuing the marital estate.[13] We remanded in *Murray* because a clear understanding of the lower court's ruling was impossible: without factual findings on the value of the marital estate, we could not review the decision to invade separate property.[14] MAPCO claims that the case at bar is similar to *Murray* because "[i]t is impossible to determine from the trial court's verdict how, if at all, the trial court resolved [the] material conflict between [Faulk's] testimony and his documents." That is, MAPCO claims that we cannot meaningfully review the superior court's ruling because the superior court failed to comment on the inconsistency between Faulk's trial testimony and his 1996 written statement to the Municipality.

However, it is obvious how the trial court resolved this conflict: it accepted Faulk's testimony as credible, in spite of the allegedly inconsistent earlier statement. Because the superior court accepted Faulk's trespass theory, which was based primarily on evidence from Faulk's own testimony,[15] we must infer that the superior court accepted Faulk's testimony as credible, and did not view the 1996 letter as destroying this credibility. Similarly, in *Frontier Saloon, Inc. v. Short*, we refused to remand because, even though the factual findings were brief, it was "readily apparent" that the lower court accepted the testimony of one side's witnesses and rejected the testimony of witnesses presented by the other side.[16] In *Frontier Saloon*, a builder brought suit to recover for extra work done, and the lower court entered a judgment for the builder.[17] We held that detailed findings were not necessary because "it is readily apparent that the trial court accepted [the builder's] testimony and rejected [the saloon's] conflicting testimony as to the disputed items."[18] Here it is also obvious that the trial court accepted Faulk's testimony and Faulk's causation theory.

The findings of the superior court below also addressed and resolved all critical issues and claims and are therefore sufficiently detailed under Civil Rule 52(a). MAPCO cites the Fifth Circuit's decision in *Echols v. Sullivan*[19] in its attempt to show that the superior court's findings failed to address critical is-

11. *See Sullivan*, 2 P.3d at 69–72 (lower court failed to address or resolve critical disputes or claims); *Beaulieu v. Elliott*, 434 P.2d 665, 670 (Alaska 1967) (findings not detailed enough for meaningful appellate review).

12. 856 P.2d 463 (Alaska 1993).

13. *Id.* at 466.

14. *Id.*

15. Faulk's testimony established the existence of the pooled water along the southern wall of the Faulk building, the stream that erupted from the

loading area, and the fact that the pool at the southern wall gradually subsided as the stream continued to flow.

16. 557 P.2d 779, 781 (Alaska 1976).

17. *Id.* at 780–81.

18. *Id.* at 781.

19. 521 F.2d 206 (5th Cir.1975).

sues-the inconsistency between Faulk's trial testimony and his 1996 letter and Faulk's failure to rebut or address MAPCO's expert testimony. In *Echols,* the trial court entered a judgment against a prisoner who filed a § 1983 action; the Fifth Circuit held that the trial court did not issue adequate findings because it failed to address critical issues, including whether the prisoner was beaten or threatened.[20] However, this case is not like *Echols* or any of our similar decisions ordering a remand on this basis. The "critical issues" here were the elements of Faulk's trespass claim: ownership, invasion, and damages. Judge Reese addressed and resolved all three of these issues. MAPCO is essentially arguing that the superior court should have been required to explain its determination of each witness's credibility, and to explain why it found Faulk's witnesses to be more credible than MAPCO's witnesses. We have never required a lower court to do this.

2. *The superior court's factual findings supporting its finding of liability were not clearly erroneous.*

 MAPCO also claims that the factual findings underlying the superior court's verdict are clearly erroneous. MAPCO has a heavy burden here: in order to reverse, we must have a "definite and firm conviction that a mistake has been made."[21] In determining whether a mistake has been made, we will take the view of the evidence most favorable to the prevailing party below.[22]

 Trespass is an unauthorized intrusion or invasion of another's land.[23] MAPCO does not dispute that an unauthorized intrusion occurred; rather, MAPCO disputes that the intrusion caused Faulk's damages.

MAPCO claims that it presented "overwhelming" evidence of its own causation theory, and that Faulk neither rebutted MAPCO's causation theory nor presented credible evidence for his own.

MAPCO's witness, Steve Johnson, testified that groundwater seepage, together with the conditions of the soil and the building, caused the damage.[24] MAPCO's theory was that groundwater seeped into channels just under the warehouse floor and then escaped through the hole that appeared in 1995 while Faulk was excavating the loading area. This process was assisted by the formation of frost lenses and the poor condition of the building-specifically, the warehouse slab floor which allegedly could not withstand Odom Corporation's traffic.

MAPCO claims that, in contrast, Faulk failed to prove his competing causation theory—that the snow melt migrated from the southern wall underneath the building to the loading area. MAPCO claims that Faulk's only evidence was Faulk's observation of water at the southern wall of his building and Faulk's belief that this water migrated to the loading area and under the warehouse slab. MAPCO claims that it rebutted Faulk's theory with its expert testimony: Johnson testified that the depth of pooled water observed by Faulk at the southern wall could not acquire a sufficient "hydraulic head" (pressure) to migrate all the way through to the loading area and cause the blowout and stream described by Faulk. Also, MAPCO claims that Faulk's theory makes no sense because, if the buried northern wall[25] acted as a dam that held back the water until Faulk's 1995 excavations, the buried southern wall should have done so even more effectively—with the help of impermeable

---

20. *Id.* at 207.

21. *Kilmer v. Dillingham City School Dist.,* 932 P.2d 757, 763–64 (Alaska 1997).

22. *See id.* at 764.

23. *See Parks Hiway Enterprises, L.L.C. v. CEM Leasing, Inc.,* 995 P.2d 657, 664 (Alaska 2000); Restatement (Second) of Torts §§ 158, 163 (1965).

24. Specifically, Johnson testified that the following conditions of the soil contributed to the damage: high ground water, "frost susceptible" silty sand, and the formation of frost lenses. Johnson did not personally undertake any geotechnical exploration of the Faulk property, he did not install any monitoring wells on the property, and he did no mapping of the drainage on the property.

25. The walls of the Faulk building continued under the ground for 4.5 feet.

soils-keeping water from seeping under the building entirely.

However, Faulk's causation theory was not impossible on its face and was supported by evidence in the record. Faulk's causation theory is that the snow melt migrated from the southern wall underneath the building to the loading area. Once there, the snow melt caused problems in the loading area and then eventually blew through the underground portion of the northern wall in a stream while Faulk was excavating the area. It then created channels under the warehouse, carrying sand out of the space under the building with it as it went. This created voids under the warehouse floor and caused the floor's failure.

Every part of Faulk's theory has support in the record. First, Faulk himself testified about the stream that blew out while he was excavating in the loading area. Faulk testified that as the stream continued to flow, the water level at the southern wall began to drop until the pools were almost gone. A reasonable conclusion to draw is that the snow melt water from the pools was flowing under the warehouse out through the hole in the loading area. Faulk also testified that a large quantity of sand came out with the water.

Second, MAPCO's expert, Johnson, seemed to confirm the validity of this theory by stating that water could flow under the building, taking sand with it, if there was a hole at one end to release the water (an "open channel flow").[26] Also, both Johnson and MAPCO's witness, Mobley, confirmed that the concrete blocks of the walls of the building that extended underground were permeable—meaning that the pooled water could have seeped through them into the space under the warehouse slab.

Also, one of Faulk's employees, an engineer named Arthur Whitmer, testified that the cracks and heaving in the warehouse floor slab that he observed were not really consistent with frost action.

Finally, it should also be noted that acceptance of Faulk's theory is not clear error simply because MAPCO presented expert testimony on its causation theory and Faulk failed to rebut this evidence with expert testimony of his own. As we have stated, a court is not bound by expert testimony of one party simply because the other side failed to present contrary expert testimony.[27]

Construing the evidence in Faulk's favor, Faulk's causation theory is supported by the evidence, and therefore the superior court's factual findings accepting this theory are not clearly erroneous.

3. *Quasi-estoppel does not apply to bar Faulk's claims.*

■ MAPCO claims that quasi-estoppel should bar Faulk's claims, because the position that he took in his May 1996 letter to the Municipality of Anchorage was inconsistent with his position at trial. This is a question of law that we review de novo.[28]

In his 1996 letter, Faulk asserted that the parking area was constructed using substandard methods and materials, and that this caused the breakup of the asphalt in the loading area during 1995 and 1996. MAPCO maintains that at trial, Faulk stated a "fundamentally inconsistent" position: that the loading area problems were instead caused by the water migrating from the MAPCO snow melt.

■ However, this quasi-estoppel argument is waived because it was not presented below.[29] MAPCO did not explicitly claim quasi-estoppel, or any kind of estoppel, either

---

**26.** However, Johnson testified that he believed that the failure of the warehouse slab was caused by high ground water, and not snow melt. Therefore, Johnson implied that the stream that Faulk testified about was created by ground water, not snow melt.

**27.** *See Alto v. State,* 565 P.2d 492, 503 n. 17 (Alaska 1977) (refusing to treat expert medical testimony as conclusive merely because it is not disputed by other medical testimony).

**28.** *See Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 26 (Alaska 1998).

**29.** As a general rule, this court will not consider arguments attacking a judgment for the first time on appeal. *See Frost v. Ayojiak,* 957 P.2d 1353, 1355–56 (Alaska 1998).

at trial or in its answer to the complaint. In his opening statement at trial, defense counsel stated that, as a reason to doubt Faulk's causation theory, the court should consider "Mr. Faulk's own admission to the Municipality of Anchorage in his statement to the municipal assessor when it benefits him to say it that the materials surrounding that building were unsuitable and caused frost heaving, and caused trucks to get stuck in the mud." But this statement was not enough to raise the issue of quasi-estoppel. Read in the context of defense counsel's opening statement, this argument focused on Faulk's credibility as a witness, rather than a claim for quasi-estoppel.

 Moreover, even if the quasi-estoppel argument had been preserved, the argument would fail on its merits. In the seminal case of *Jamison v. Consolidated Utilities, Inc.*, we established that trial courts must consider three factors in evaluating quasi-estoppel claims: (i) the offending party has gained an advantage or produced some disadvantage by asserting the first (inconsistent) position; (ii) the inconsistency is great enough to make the second position unconscionable; and (iii) the first assertion was made in full knowledge of the facts.[30]

None of the *Jamison* factors supports a finding of quasi-estoppel. First of all, Faulk did not receive any advantage by stating that the loading area problems were caused by substandard asphalt. As MAPCO points out, it is true that the May 1996 letter was successful in securing a more favorable tax assessment for Faulk. However, the advantage secured was not related to the statement that MAPCO complains of. The objective of the May 1996 letter was to receive a more favorable tax assessment by showing that the property was less valuable than the Municipality had claimed earlier; the *cause* of the property's problems was irrelevant to the tax assessment. Thus, even if Faulk misstated

the cause of these problems, this would not affect the tax assessment.

Moreover, the inconsistency does not rise to the level of unconscionability. Indeed, it is unclear that there is even a real inconsistency here. In the 1996 letter, Faulk stated that the parking area was built using substandard methods and materials. MAPCO does not point to any section of the record in which Faulk contradicted this assertion at trial. In fact, Faulk reaffirmed the statement in the 1996 letter at trial by stating that he believed that some areas of the parking area (but not the loading area) were poorly built. Also, Faulk stated that during the 1995 repairs he came to believe that the subsurface materials were not at fault for the loading area problems. Faulk stated at trial that in the May 1996 letter he was referring to the parking area *asphalt*, including the asphalt in the loading area[31]—he did not explicitly claim in the May 1996 letter that the subsurface materials under the loading area were substandard or improperly constructed. More generally, Faulk's claim that the asphalt was substandard is not inconsistent with his claim that the MAPCO snow melt caused the loading area problems as well as the failure of the warehouse slab. It could be that the substandard asphalt combined with the invading water to cause the loading area problems. Thus, any inconsistency between the letter and his trial testimony cannot be characterized as unconscionable.

As for the final *Jamison* factor, it does not seem that Faulk's assertions in the 1996 letter were made in "full knowledge of the facts."[32] As MAPCO points out, the stream of water in the loading area was observed in the summer of 1995, before the 1996 letter was written. So, in 1996, Faulk did suspect that MAPCO's snow melt was the cause of the damage in the loading area. However, in

**30.** 576 P.2d 97, 102–03 (Alaska 1978).

**31.** At trial, during cross-examination Faulk stated:
> Q. [Plaintiff's counsel]: Looking at [the May 1996 letter], can you explain what you meant in your references to heaving problems and breaking up?

> A. [Faulk]: The asphalt had completely deteriorated and was moved in sections in the loading bay. All of the asphalt in the parking lots need replacing.

Faulk also reaffirmed the statements made in the May 1996 letter.

**32.** 576 P.2d at 103.

May 1996 Faulk did not yet know about the damage to the warehouse floor; evidence of this did not appear until the summer of 1996. At the least, Faulk did not know the full extent of the damage caused by the water in May 1996. Therefore, MAPCO has failed to show that quasi-estoppel applies here.

B. *The Superior Court Properly Refused to Affirm the Acceptance of Faulk's Offer of Judgment After the Trial.*

■ MAPCO also claims that the judgment below should be reversed because MAPCO accepted a valid pretrial offer of judgment made by Faulk. MAPCO asserts that the accepted offer of judgment should be substituted for the superior court's judgment. We reject this argument.

Under Civil Rule 68, a party may make an offer of judgment more than ten days before trial that is non-revocable for ten days.[33] On October 18, 1999, Faulk made a Rule 68 offer of judgment to MAPCO in the amount of $100,000. At the time this offer was made, it was timely under Rule 68 because trial was scheduled for sometime in December, more than ten days later. On October 25, 1999, the parties were informed by the superior court that trial would commence on October 27, and the trial did start on that date. After the trial and the November 1, 1999 verdict in Faulk's favor, MAPCO attempted to accept Faulk's offer of judgment, on November 1. MAPCO claims that this acceptance was timely because it was within ten days of the

offer's issuance, plus three days due to service by mail. However, the superior court refused to affirm this judgment, ruling that the offer was invalid, since it was made within ten days of the beginning of trial.

Citing decisions of this court that have stated that a valid Rule 68 offer is "irrevocable" for ten days,[34] MAPCO claims that it had an "absolute right" to accept Faulk's offer, and that this right was not affected by the trial or the superior court's verdict. MAPCO's argument is that in this situation Rule 68 gives it the power to choose between the verdict issued by the court and the offer made by the plaintiff.

■ However, Rule 68 applies to offers of judgment made "more than ten days before the trial begins." Because Faulk's offer was not made more than ten days before the trial actually began, the literal language of the rule would not apply to Faulk's offer. Given the unusual situation present here, it is conceivable that interests of justice might have required the rule's literal language to be relaxed to accommodate an acceptance made before the trial concluded. But extending the time for acceptance until after the verdict would clearly violate the spirit and purpose of Rule 68. As three other state jurisdictions have held under their corresponding rules,[35] the purpose of Rule 68 is to encourage pretrial settlement, and this goal is frustrated if parties are allowed to pick and choose between the settlement offer and a known ver-

---

**33.** Rule 68(a) states:

At any time more than 10 days before the trial begins, either ... party ... may serve upon the adverse party an offer to allow judgment to be entered in complete satisfaction of the claim.... The offer may not be revoked in the 10 day period following service of the offer. If within 10 days after service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service, and the clerk shall enter judgment. An offer not accepted within 10 days is considered withdrawn.

**34.** *See LaPerriere v. Shrum,* 721 P.2d 630, 634–35 (Alaska 1986); *Rules v. Sturn,* 661 P.2d 615, 618–19 (Alaska 1983). These decisions only stand for the proposition that the *offeror* cannot by oral or written communication rescind or revoke its offer for 10 days after it is issued.

**35.** *See Wersch v. Radnor/Landgrant,* 192 Ariz. 99, 961 P.2d 1047, 1049–50 (App.1997) (holding that, where defendant moved for summary judgment and then made offer of judgment, and lower court subsequently found in favor of defendant, plaintiff could not then accept the offer of judgment because offer terminated when summary judgment was issued); *Braham v. Carncross,* 514 So.2d 71, 72–73 (Fla.App.1987) (holding that, where defendant made an offer of judgment prior to a trial and verdict favoring defendant, plaintiff could not accept offer of judgment after verdict); *Tucker v. Benevolent & Protective Order of Elks Lodge # 417,* 6 P.3d 1082, 1084–87 (Okla.Civ.App.2000) (holding that, where defendant made an offer of judgment prior to a trial and verdict favoring defendant, plaintiff could not then accept offer of judgment after verdict).

dict, after subjecting all parties and the state to the time and expense of a trial.[36]

### C. *A Remand Is Required for Portions of the Superior Court's Compensatory Damages Award.*

Having affirmed the finding of liability, we must next examine the award of compensatory damages. MAPCO claims that (1) the superior court failed to enumerate "clear and explicit" findings on compensatory damages as required by Civil Rule 52(a), and (2) the superior court's findings supporting its award of compensatory damages were clearly erroneous. We reject the first of these arguments; however, MAPCO is correct in its second argument as to some of the compensatory damages awarded.

#### 1. *The superior court's findings on compensatory damages were sufficiently "clear and explicit."*

■ As discussed earlier, Rule 52(a) requires the superior court to issue factual findings that are sufficiently "clear and explicit" to allow this court to analyze the decision below.[37] MAPCO claims that the superior court failed to issue "clear and explicit" findings to support the court's award of compensatory damages. MAPCO points out that, in the initial verdict, the court did not explain how it arrived at the figure of $65,856.43. Upon a motion for reconsideration, the court revised this figure—again without explanation—to $106,815.43.

However, as Faulk points out, the court apparently agreed with Faulk's computation of his damages, and simply adopted his methodology. After Faulk's motion for reconsideration, the court awarded the sum requested by Faulk—$106,815.43. Faulk's methodology for reaching this amount is clearly laid out in Faulk's motion for reconsideration and based on specific testimony presented at trial. The $106,815.43 figure is arrived at by adding together (i) repairs from 1994 through December 18, 1996, (ii) repairs from December 19, 1996 through March 31, 1998, and (iii) professional and consulting service fees.

We have in three other decisions remanded, or implied that we should remand, for lack of "clear and explicit" findings on damages; however, in these decisions there were no findings to support the award of damages, nor did we have enough information to understand the damages award.[38] In this appeal, the superior court's damages findings are more than adequately explained by the computations included in Faulk's motion for reconsideration read in conjunction with evidence presented at the trial.

#### 2. *Portions of the award of compensatory damages require further findings.*

MAPCO also argues that certain aspects of the compensatory damages award were clearly erroneous. We agree that some portions of the award are problematic and that further findings are required.

MAPCO alleges three errors. MAPCO claims that (a) the costs included double billing for equipment leasing; (b) the labor costs submitted by Faulk for repairs were inflated; and (c) the costs included repair of areas of the Faulk property not affected by the MAPCO snow melt.

#### a. *Faulk's costs may have included some double billing.*

■ MAPCO asserts that Faulk double billed for his own labor time in his computation of damages. Faulk allegedly did this by

---

**36.** We do not decide whether, under circumstances where a trial date is accelerated by the court, a party in MAPCO's position could accept the offer of judgment after the commencement of trial but before the verdict is rendered.

**37.** *See Sullivan v. Subramanian,* 2 P.3d 66, 69 (Alaska 2000).

**38.** *Fairbanks Builders, Inc. v. Morton DeLima, Inc.,* 483 P.2d 194, 196–97 (Alaska 1971) (holding that there were inadequate factual findings to support a damages award, but refusing to remand because the defendant did not challenge the amount or award of damages; the sole challenge was to the adequacy of the findings); *Beaulieu v. Elliott,* 434 P.2d 665, 670 (Alaska 1967) (in personal injury case, remanding for adequate findings on causation); *Patrick v. Sedwick,* 413 P.2d 169, 175–76 (Alaska 1966) (remanding for findings to explain inconsistency between past and future damages).

billing the same time in the following manner. While Faulk was operating equipment at the warehouse, Faulk billed his own time at an hourly rate. At the same time, Faulk billed the equipment use at a "wet" rate that included a charge for the operator—while Faulk himself was the operator. This is double billing, MAPCO claims, because the operator's time is not separately billed—it is part of the enhanced "wet" rate for the equipment.

Faulk denies double billing and claims that "there is no evidence" that he actually separately billed for any time that he spent operating equipment.

It is difficult to tell from the record which party is correct here. Faulk did indicate at the trial that the "wet" rate for equipment was sometimes used when he himself was the operator.[39] And Faulk indicated that he billed his own time as a "supervisor" for some work at $39.60 an hour.[40] However, it is not clear from the record whether these two charges actually overlapped. The alleged double billing, if true, would warrant a reduction in the compensatory damages award. Therefore, a remand is required to clarify whether any double billing occurred.

b. *Faulk's labor costs were not inflated.*

 MAPCO claims that Faulk's labor costs were inflated because they included a markup and did not represent the actual cost to Faulk. Faulk used his own business's laborers to do the repair work. Instead of claiming as damages the actual amounts that he paid them, he claimed the normal rates billed to his clients for work done by these laborers and his company. MAPCO claims that Faulk is only entitled to the money that he actually paid the laborers.

 Without citing any authority, Faulk claims that he should be able to use normal market rates as a basis for calculating his repair costs. Faulk is generally correct. When a party is damaged and repairs the damage itself using its own workforce and equipment, that party is entitled to normal market rates for the use of the labor and equipment, as if the party had contracted the job out to some third party.[41] If Faulk's regular workforce and equipment were tied up undertaking the repairs, then Faulk incurred an opportunity cost, since he could have been using these resources elsewhere to generate revenue for his business.[42] Compensating him at normal market rates for the time spent on the repairs would fully compensate Faulk for this opportunity cost. Because the record indicates that Faulk used his own workforce to make the repairs, we cannot say that the award of compensatory damages for the full labor costs claimed by

**39.** *See* trial transcript at 200.

**40.** *See* trial transcript at 228.

**41.** In *Boh Brothers Construction v. M/V Tag-Along*, 569 F.2d 217 (5th Cir.1978), a construction company plaintiff was seeking recovery from a negligent towing vehicle that damaged a bridge the plaintiff was building. *Id.* at 218. The damage was repaired by the plaintiff. *Id.* at 219. The court remanded the lower court's damages calculation partly because the lower court failed to use the normal market rates for the plaintiff's equipment. *Id.*

In *Arrow Concrete Co. v. Sheppard*, 96 Ohio App.3d 747, 645 N.E.2d 1310 (1994), the plaintiff brought suit against a defendant for negligently causing damage to a building that the plaintiff was building. *Id.* at 1310–11. The plaintiff did the repairs himself, and the court rejected the argument that a reasonable market rate (applied to the plaintiff's own time) could not be used to calculate the cost of repair. *Id.* at 1311–12. The court held that "regardless of whether [plaintiff] hired a third party to do the work or performed the work himself, he is entitled to the same recovery: the reasonable cost of repair." *Id.* at 1312.

**42.** As the Fifth Circuit stated in *Boh Brothers Construction*:

Much of the repair work was performed by Boh Bros.'s regular work force, using plaintiff's own tools and equipment.... However, it is not clear whether the Judge included reasonable profits for the plaintiff's use of its own equipment and personnel in calculating the award. Had the plaintiff paid another business to do the repair work, the charge would certainly reflect an element of profit. The fact that plaintiff did the work itself does not make the element of profit any less recoverable, certainly in the sense that the tort victim ought not to suffer a further "loss" from the use of its own equipment which might otherwise be engaged in profitable outside employment.

569 F.2d at 219.

Faulk was clearly erroneous.[43]

#### c. *Faulk's costs did not include repair for areas of the Faulk property that were not affected by the MAPCO snow melt.*

■ MAPCO's last assertion of error concerning compensatory damages is that Faulk's submitted damages included costs for paving and gravel to repair areas that were not affected by the MAPCO snow melt. We find no error here.

MAPCO claims that extra paving was done to the west and north of the area affected by the snow melt, and that Faulk included the cost for this additional work in his submission of damages. The record does not indicate that extra paving was done. The extent of the paving is clearly marked in the record. It is true that the paving does radiate some distance from the loading area. However, it is also true that the extent of the damage to the loading area was substantial and it is unclear from the record just how far out this damage radiated from the loading area itself. Faulk testified at trial that the entire amount of the paving expenses was "fair and reasonable." We cannot say that the superior court's award of compensatory damages for paving this entire area was clearly erroneous.

■ MAPCO also claims that Faulk listed as damages the cost of gravel hauled in for other buildings Faulk owned—specifically, the "Sandlewood building" next door to 8401 Brayton Drive. MAPCO points to Faulk's testimony that he wrote on the gravel invoices the name of the Sandlewood building, instead of the building at 8401 Brayton Drive.

However, Faulk testified that he filled the invoices out this way to prevent Odom Corporation, his tenant, from being billed for the gravel, so that the bills would instead go to Faulk's business. Faulk explicitly testified that the gravel was only used for the loading area at 8401 Brayton Drive, and not for any other Faulk building.[44] Again, we cannot say that the superior court's award of compensatory damages for all of the gravel used was clearly erroneous.

#### D. *A Remand Is Required for Reconsideration of the Punitive Damages Award.*

In addition to the $106,815.43 award of compensatory damages, the superior court awarded an identical amount of punitive damages to Faulk. In this appeal, MAPCO claims that the award of punitive damages was improper because (1) Faulk "abandoned" his claim for punitive damages and because (2) the award itself was manifestly unreasonable.

#### 1. *Faulk did not abandon his claim for punitive damages.*

■ MAPCO claims that Faulk abandoned his claim for punitive damages by failing to mention them in his initial disclosures, in response to an interrogatory, and at trial.[45] Civil Rule 26(a)(1)(G) states that a party's initial disclosures must state "all categories of damages claimed." In his initial disclosures, Faulk did not explicitly mention punitive damages, but he stated that documents supported "the damages claimed." This can certainly be read to refer to the damages claimed in Faulk's complaint, including both compensatory and punitive damages. The requirements of Rule 26(a)(1)(G) are fulfilled here by the reference in the initial disclosures. All parties were on notice of the punitive damages claim in the com-

---

**43.** MAPCO claimed both below and on appeal that many or all of Faulk's workers were casual workers, and that therefore the sums paid to these workers (in cash) represented Faulk's total labor costs. However, the only evidence in the record concerning these workers is Faulk's testimony and records, which indicate that the workers were "employees," and show their pay rates; the record does not clearly indicate that any of these workers were casual workers. Therefore, MAPCO's argument is not supported by evidence in the record.

**44.** MAPCO claims that this testimony is controverted by the testimony of Faulk's manager, Mark Marlow. However, Marlow's testimony concerned a completely different invoice that explicitly referenced the "ANCO" building (8401 Brayton Drive), and not the Sandlewood building.

**45.** But Faulk did request punitive damages in his complaint and in the April 1999 pretrial meeting report.

plaint, and we decline to treat any later failures to mention punitive damages as waiver or abandonment of the punitive damages claim.

■ MAPCO also claims that punitive damages were not mentioned in response to a specific interrogatory from MAPCO on damages. This interrogatory stated: "Please list all damages claimed by the Plaintiff." Faulk responded with "Please see Plaintiff's Documents No. 000066 through 000076 and Documents No. 000242 through 000285"; Faulk claims that these documents were pertinent to claims for both compensatory and punitive damages; however, Faulk implies that the documents only directly support claims for compensatory damages. Nevertheless, we decline to hold that this answer constitutes a "waiver" or "abandonment" of the punitive damages claim.

Finally, MAPCO notes that punitive damages were not mentioned or discussed at trial. However, the circumstances of the trial were unusual. Judge Reese stated at the onset of the trial that an opening statement was not necessary because the court was "familiar with the case." Nevertheless, because the plaintiff's first witness had not yet arrived, Faulk's counsel used the time to make a short opening statement that did not raise the issue of punitive damages. Closing arguments were waived by both parties, because MAPCO's counsel had scheduling difficulties and, as revealed at oral argument, a death in the family. Thus, while Faulk never waived his claim for punitive damages at trial, MAPCO never had an opportunity to address the question of punitive damages. Because we remand the issue for further consideration and findings, the superior court should give the parties an opportunity to address the issue of punitive damages through oral or written argument on remand.

2. *The superior court's findings are inadequate to support the award of punitive damages.*

■ We have most recently discussed the requirements for an award of punitive damages in *Wal–Mart, Inc. v. Stewart*:[46]

Punitive damages may not be awarded in an action, whether in tort, contract, or otherwise, unless supported by clear and convincing evidence. To support a claim for punitive damages, the plaintiff must prove by clear and convincing evidence that the defendant's conduct was outrageous, such as acts done with malice, bad motive, or reckless indifference to the interests of another. We have stated that a showing of malice is not required; however, [the plaintiff] must establish that [the defendant's] conduct amounted to reckless indifference to the rights of others, and conscious action in deliberate disregard of [those rights].[47]

Two aspects of the superior court's punitive damages award are problematic: the court's award is based on a finding that is not supported by any evidence in the record, and the increase in the award between the verdict of November 1, 1999 and the final judgment of December 7, 1999 is not explained by the court.

The superior court's award of punitive damages is based on the following factual finding: "[T]he intentional trespass was authorized [by] Mr. Farnsworth on behalf of MAPCO after being informed of the problem that the trespass was causing ... *and it was therefore done with the deliberate intent to cause injury to the Faulk property.*" (Emphasis added.) There is no evidence in the record to support the finding that the trespass was done with the "deliberate intent to cause injury" to Faulk's property. There is evidence that tends to show that MAPCO negligently or willfully failed to stop stockpiling snow on the MAPCO property, after Faulk warned MAPCO several times that there was a problem with the snow pile. However, this is not evidence that tends to show that MAPCO had a deliberate intent to cause injury.

As noted above, although a finding of malice is not required to support an award of punitive damages, a finding of "reckless in-

---

**46.** 990 P.2d 626 (Alaska 1999).

**47.** *Id.* at 636 (final alteration in original) (citations and quotations omitted).

difference" is required.[48] We remand to the superior court for findings in accordance with the proper standard.

Also, the increase in the punitive damages award between November 1, 1999 and December 7, 1999 is not supported by any explanation, reasoning, or analysis. On November 1, 1999, the superior court awarded $65,856.43 in punitive damages. Upon a motion for reconsideration, the superior court increased this figure without any reasoning or explanation to $106,815.43. As discussed earlier, we must reverse the superior court's findings under Rule 52(a) when no findings are made to support the court's conclusion.[49]

We have held that a number of considerations go into the award of punitive damages. These include: (i) the magnitude and flagrancy of the offense, (ii) the importance of the policy violated, (iii) the ratio of punitive damages to compensatory damages, and (iv) the wealth of the defendant.[50] The superior court in this case did not explicitly consider any of these factors, and in granting the December 7 increase implicitly considered only the ratio of punitive to compensatory damages, since the ratio remained at 1:1. Yet we have repeatedly stated that the ratio of punitive to compensatory damages is not the determinative factor.[51] Because this increase from $65,856.43 to $106,815.43 was not explained by any findings, we must reverse the award of punitive damages and remand to the superior court for reconsideration of punitive damages and findings.

## V. CONCLUSION

Because the superior court's factual findings on liability were sufficiently clear and explicit, because these findings were not clearly erroneous, because quasi-estoppel does not apply, and because Faulk's offer of judgment became invalid once a verdict was announced, we AFFIRM the superior court's finding of liability in favor of Faulk. However, because portions of the compensatory damages award were clearly erroneous, and because the award of punitive damages requires further consideration and findings, we REVERSE the award of compensatory and punitive damages and REMAND for further proceedings consistent with this opinion.

MATTHEWS, Justice, not participating.

**48.** *Wal–Mart, Inc.,* 990 P.2d at 636.

**49.** *See Johnson v. Johnson,* 836 P.2d 930, 933–34 (Alaska 1992).

**50.** *See International Broth. of Elec. Workers Local 1547 v. Alaska Util. Constr., Inc.,* 976 P.2d 852, 858 (Alaska 1999) (citing *Sturm, Ruger & Co. v. Day,* 594 P.2d 38 (Alaska 1979), *modified,* 615 P.2d 621 (1980), *modified,* 627 P.2d 204 (1981), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), *overruled on other grounds*

by *Dura Corp. v. Harned,* 703 P.2d 396, 405 n. 5 (Alaska 1985)); *Norcon, Inc. v. Kotowski,* 971 P.2d 158, 175 (Alaska 1999).

AS 09.17.020(c) also provides a list of factors to consider; however, this statute is not applicable because all of the events in this appeal took place before the effective date of the statute, August 7, 1997. *See Norcon,* 971 P.2d at 175 n. 21.

**51.** *See Norcon,* 971 P.2d at 175–76; *Sturm, Ruger,* 615 P.2d at 624 n. 3.